**PLANNED PARENTHOOD OF MIDDLE TENNESSEE, et al.**

v.

**Don SUNDQUIST, Governor of the State of Tennessee, et al.**

Supreme Court of Tennessee, at Nashville.

Sept. 15, 2000.

Barry Friedman, Vanderbilt University School of Law, Irwin Venick, Nashville, TN; Elizabeth B. McCallum, Washington, DC; Barbara E. Otten, Dara Klassel, and Roger K. Evans, Planned Parenthood Federation of America, Inc., Louise Melling and Catherine Weiss, American Civil Liberties Foundation Reproductive Freedom Project, New York, NY, for appellant, Planned Parenthood of Middle Tennessee, et al.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Andy D. Bennett, Chief Deputy Attorney General; and Michael W. Catalano, Associate Solicitor General, for appellees, Don Sundquist, Governor of the State of Tennessee, et al.

Miranda Schiller and Ilyssa M. Birnbach, New York, NY, and Dianna Baker Shaw, Nashville, TN, for Amicus Curiae, American College of Obstetricians and Gynecologists.

Kevin H. Theriot, Panama City Beach, FL; Larry L. Crain, Brentwood, TN; and Gary S. McCaleb, Scottsdale, AZ, for Amicus Curiae, Tennessee Right to Life.

Elizabeth Cavendish and Scott Grogan, Washington, DC, and Ann Martin, Nashville, TN, for Amici Curiae, The National Abortion and Reproductive Rights Action League, The NARAL Foundation, The League of Women Voters of Tennessee, The Tennessee Task Force Against Domestic Violence, and the National Council of Jewish Women.

Paul Benjamin Linton, Northbrook, IL, and Clinton W. Watkins, Brentwood, TN, for Amici Curiae, Members of the Tennessee General Assembly.

Keith Jordan, Nashville, TN, and J. Thomas Smith, Franklin, TN, for Amicus Curiae, Dr. Kent Jones, et al., on Behalf of the Tennessee Physicians Resource Council.

## OPINION

ANDERSON, C.J., delivered the opinion of the court, in which DROWOTA, BIRCH, and HOLDER, JJ., joined.

This is an appeal from the Circuit Court for Davidson County, which applied an undue burden standard and struck down as unconstitutional the provisions of Tennessee's criminal abortion statutes requiring that physicians inform their patients that "abortion in a considerable number of cases constitutes a major surgical procedure," Tenn.Code Ann. § 39–15–202(b)(4) (1997), and mandating a two-day waiting period requirement, § 39–15–202(d)(1). The trial court upheld the second trimester hospitalization requirement, § 39–15–201(c)(2), the remaining informed consent requirements, § 39–15–202(b)(1)–(3), (b)(5)-(c), and the medical emergency exceptions, § 39–15–202(d)(3), (g). The Court of Appeals reversed the judgment of the trial court in part and affirmed in part. The Court of Appeals upheld the following provisions as not imposing an undue burden: the waiting period requirement, based upon the facts of this case, the second trimester hospitalization requirement, and, except for the "major surgical procedure" provision, the remaining informed consent requirements. We granted application for permission to appeal those is-

sues of first impression. We specifically hold that a woman's right to terminate her pregnancy is a vital part of the right to privacy guaranteed by the Tennessee Constitution. We further hold that the right is inherent in the concept of ordered liberty embodied in our constitution and is therefore fundamental. Accordingly, the statutes regulating this fundamental right must be subjected to strict scrutiny analysis. When reviewed under the correct standard, we conclude that none of the statutory provisions at issue withstand such scrutiny. The Court of Appeals' judgment is therefore affirmed in part and reversed in part.

We granted this appeal to review the constitutionality of Tennessee's abortion statutes, which restrict the circumstances under which a woman may obtain an abortion and impose criminal liability upon physicians who fail to comply with the statutory restrictions and requirements. After our review of the record and applicable authority, we conclude that the Court of Appeals erred in failing to apply the appropriate standard under the Tennessee Constitution. We conclude that a woman's right to terminate her pregnancy is a vital part of the right to privacy guaranteed by the Tennessee Constitution. As this right is inherent in the concept of ordered liberty embodied in the Tennessee Constitution, we conclude that the right to terminate one's pregnancy is fundamental. The standard we have traditionally applied to

fundamental rights requires that statutes regulating fundamental rights be subjected to strict scrutiny analysis. Moreover, when reviewed under the strict scrutiny standard, we conclude that none of the statutory provisions at issue withstand such scrutiny. The Court of Appeals' judgment is therefore affirmed in part and reversed in part.

## I. PROCEDURAL BACKGROUND

The abortion statutes at issue in this appeal are codified at Tenn.Code Ann. §§ 39–15–201 and –202 (1997). Among other things, these statutes mandate that second trimester abortions be performed in a hospital, § 201(c)(2) (the second trimester hospitalization requirement); that the "attending physician" inform the patient of statutorily prescribed information, § 202(b), and (c) (the informed consent and physician only counseling requirements); that after receiving this information, the patient must wait a mandatory two-day period before returning to the attending physician, signing a consent form, and obtaining the abortion, § 202(d)(1) (the mandatory waiting period requirement); and, finally, that medical emergency exceptions to the two-day waiting period requirement and the informed consent requirements are permitted when the patient's life would otherwise be in danger, § 202(d)(3), and (g) (the medical emergency exceptions).[1]

---

**1.** For clarification, we note that the following issues are not before this Court: the provision requiring that a woman seeking an abortion be a Tennessee resident, Tenn.Code Ann. § 39–15–201(d); the provisions regulating abortions performed on minors, Tenn.Code Ann. § 39–15–202(f)(Supp.1989) (repealed) (now codified at Tenn.Code Ann. §§ 37–10–301 through –307); and the provision banning post-viability abortions except to preserve the life or health of the woman, Tenn. Code Ann. § 39–15–201(c)(3).

The State chose not to defend the constitutionality of the residency requirement, and the trial court struck it as unconstitutional. Regarding the provisions regulating minors' abortions, Tenn.Code Ann. § 39–15–202(f) contained a parental notification requirement,

a waiting period requirement, and a medical emergency exception to these requirements when necessary "to preserve the life or health" of the pregnant minor, § –202(f). While the case was pending in the trial court, however, the General Assembly repealed the parental notification requirement. –202(f). See 1995 Tenn.Pub. Acts, ch. 458. The General Assembly replaced the parental notification requirement with the parental consent requirement, now Tenn.Code Ann. §§ 37–10–301 through –307. The Court of Appeals concluded that § 39–15–202(f) had been repealed by implication and refused to express an opinion regarding the constitutionality of Tenn. Code Ann. §§ 37–10–301 through –307. Plaintiffs did not challenge the provisions relating to post-viability abortions.

Plaintiffs, including Planned Parenthood Association of Nashville, Inc., Memphis Planned Parenthood, Inc., Washington Hill, M.D., Peter Cartwright, M.D., and Frank Boehm, M.D., [hereinafter "Planned Parenthood"], filed suit in the Davidson County Circuit Court seeking declaratory and injunctive relief under both the state and federal constitutions. Planned Parenthood alleged that certain provisions of Tennessee's criminal abortion statutes, including those listed above, violate a woman's rights to liberty, privacy, procreational autonomy, due process, equal protection of the laws, freedom of travel, freedom of conscience, and freedom of speech under article I, §§ 1, 2, 3, 7, 8, 19, 27 and article XI, §§ 8, 16 of the Tennessee Constitution; and article I, § 8; article IV, § 2; and, the Fourteenth Amendment to the United States Constitution.

Planned Parenthood argued at trial that this Court's decision in *Davis v. Davis,* 842 S.W.2d 588, 600 (Tenn.1992), recognized that the right to procreational autonomy is a fundamental right and that, consequently, Tennessee's criminal abortion statutes cannot be upheld because they are not narrowly tailored to further compelling state interests. The State argued that *Davis* should be abandoned in light of the United States Supreme Court's abortion decision in *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). In the *Casey* joint opinion, the "strict scrutiny" constitutional standard of review announced in *Roe v. Wade,* 410 U.S.

113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the standard most protective of fundamental constitutional rights, was abandoned, and the "undue burden standard," a standard which affords states broader powers to enact regulatory legislation, was adopted. *Casey,* 505 U.S. at 878, 112 S.Ct. at 2821 (joint opinion of O'Connor, Kennedy, and Souter, JJ.)

The trial court applied the undue burden standard and struck down the waiting period requirement, Tenn.Code Ann. § 39–15–202(d)(1), and the informed consent subsection requiring that physicians inform their patients that "abortion in a considerable number of cases constitutes a major surgical procedure," § –202(b)(4). The trial court, however, upheld the second trimester hospitalization requirement, the remaining informed consent requirements, and the medical emergency exceptions.[2]

■ The Court of Appeals expressed the view that our description of the nature and scope of the right of procreational autonomy in *Davis* was based "exclusively on decisions of the United States Supreme Court,"[3] and that *Planned Parenthood v. Casey's* undue burden standard is consistent with the right of procreational privacy recognized in *Davis.* The Court of Appeals found that *Casey's* undue burden standard "appropriately balances a woman's right to procreational autonomy with the State's significant interest in protecting maternal health and potential human

2. The court construed the term "hospital" in the second trimester hospitalization requirement to include "ambulatory surgical center," Tenn.Code Ann. § 39–15–201(c)(2). The court further construed the medical emergency exception so as to extend protection for not only the "life," but also the "health" of the patient. Tenn.Code Ann. § 39–15–202(d)(3).

3. We emphasize at this point that the holding in *Davis* that the state constitution protects a right to privacy which includes procreational autonomy was based upon specific provisions of the Tennessee Constitution. Although we did not specifically rule in *Davis* as to whether the state constitutional right to procreational autonomy is broader than the federal

constitutional right, we did not rest our holding with regard to the right to privacy on United States Supreme Court precedent. We reaffirm the holding that the right of privacy, including the right of procreational autonomy, arises from specific provisions of the state constitution, including article I, §§ 1 and 2 (providing that all power in inherent in the people and that the people may alter, reform, or abolish the government and that the doctrine of non-resistance against arbitrary power and oppression is destructive of the good and happiness of mankind). Tenn. Const. art. I, §§ 1 and 2. *See also* Tenn. Const. art. I, §§ 3, 7, 8, 19, and 27.

life" and adopted the undue burden standard.

The Court of Appeals concluded that the following provisions are unconstitutional for imposing an undue burden: the residency requirement, Tenn.Code Ann. § 39-15-201(d); the informed consent subsection requiring that the attending physician inform the woman that "abortion in a considerable number of cases constitutes a major surgical procedure," Tenn.Code Ann. § 39-15-202(b)(4); the medical emergency exceptions, Tenn.Code Ann. § 39-15-202(d)(3), (g); and the attending physician counseling requirement, when combined with the waiting period requirement, Tenn.Code Ann. §§ 39-15-202(b), (d)(1). The Court of Appeals upheld the following provisions as not imposing an undue burden: the waiting period requirement, based upon the facts of this case, Tenn. Code Ann. § 39-15-202(d)(1), the second trimester hospitalization requirement, Tenn.Code Ann § 39-15-201(c)(2), and the remaining informed consent provisions, Tenn.Code Ann. § 39-15-202(b)(1)(3), (b)(5)-(c).

We granted permission to appeal these issues of first impression.

## II. DEVELOPMENT OF THE LAW REGULATING ABORTIONS

Tennessee has regulated the practice of abortions by statute since at least 1883, when all abortions were illegal except to preserve the "life" of the pregnant woman. 1883 Tenn. Pub. Acts, ch. 140 (codified as Tenn.Code § 5371 and 5372 (1884)). This statute was left largely unchanged until after the United States Supreme Court's decision in *Roe v. Wade*.

In *Roe*, the United States Supreme Court recognized that a woman has a fundamental right to terminate her pregnancy and that this right is deserving of heightened scrutiny against state restrictions. 410 U.S. at 154-55, 93 S.Ct. at 727-28. The Court further recognized, however, that the State has legitimate interests in health, medical standards, and potential

life. *Id.* at 162-63, 93 S.Ct. at 731. Accordingly, the Court established a trimester framework pursuant to which the State's interests in maternal health and potential life are balanced against the woman's interest in procreational autonomy. *Id.* at 163-64, 93 S.Ct. at 731-32. Concluding that the State's interest in maternal health becomes compelling after the first trimester and that the State's interest in potential life becomes compelling after the second trimester, the United States Supreme Court struck down a Texas criminal abortion statute which, like Tennessee's statute, banned all abortions except to protect the woman's life. *Id.* at 164, 93 S.Ct. at 732.

After the *Roe v. Wade* decision, the General Assembly enacted Public Chapter 235, 1973 Tenn.Pub. Acts, ch. 235 (codified as Tenn.Code Ann. § 39-301 (Supp.1973)), which adopted the trimester framework set forth in *Roe* and placed restrictions upon the exercise of that right depending upon the point in the pregnancy during which the woman seeks an abortion, i.e., the first, second, or third trimester, and upon whether she is a resident of Tennessee. In later years, the legislature enacted additional regulations. In 1974, the General Assembly increased the punishment for statutory violations. 1974 Tenn. Pub. Acts, ch. 471 (codified as Tenn.Code Ann. § 39-301 (1975)). Then, in 1978, the General Assembly provided for State custody of a fetus born alive during an abortion, 1978 Tenn.Pub. Acts, ch. 811, § 2 (codified as Tenn.Code Ann. § 39-307 (Supp.1978)), and enacted the physician-only, informed consent requirements and the waiting period requirement. 1978 Tenn.Pub. Acts, ch. 847 (codified as Tenn. Code Ann. § 39-302 (Supp.1978)). This latter provision required the "attending physician" to orally inform the woman of statutorily prescribed information, to be followed by a two-day waiting period, before the woman may return to the physician, sign a consent form, and obtain the

abortion. *Id.*[4] The legislature recodified the abortion statutes in 1989 as a part of a general re-enactment of Tennessee's criminal code. *See* 1989 Tenn.Pub. Acts, ch. 591, § 1, Tenn.Code Ann. §§ 39–15–201 through 208 (Supp.1989); *Planned Parenthood Ass'n v. McWherter*, 817 S.W.2d 13, 16 (Tenn.1991).

## III. ANALYSIS

### A. Standard of Appellate Review

 This appeal involves a facial challenge to the constitutionality of a statute, and our review is de novo with no presumption of correctness given to the lower courts' judgments. *State v. King*, 973 S.W.2d 586, 588 (Tenn.1998). However, there are certain rules which this Court must apply when considering a facial challenge to the constitutionality of statutes. We may only invalidate a statute when it contravenes either the federal or state constitution. *See Holly v. City of Elizabethton*, 193 Tenn. 46, 53, 241 S.W.2d 1001, 1004–05 (1951). We are not permitted to impose our policy views or to second guess the General Assembly's policy judgments. *See Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 (Tenn.1997). Indeed,

> [i]n construing statutes, it is our duty to adopt a construction which will sustain a statute and avoid constitutional conflict if any reasonable construction exists that satisfies the requirements of the Constitution. *State v. Sliger*, 846 S.W.2d 262, 263 (Tenn.1993); *State v. Lyons*, 802 S.W.2d 590, 592 (Tenn.1990); *Shelby County Election Comm'n v. Turner*, 755 S.W.2d 774, 777 (Tenn.1988); *Kirk v. State*, 126 Tenn. 7, 10, 150 S.W. 83, 84 (1911). When faced with a choice between two constructions, one of which will sus-

tain the validity of the statute and avoid a conflict with the Constitution, and another which renders the statute unconstitutional, we must choose the former. *Id.*

*Davis–Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 529–30 (Tenn.1993).

We have carefully applied these principles to our review of the challenged statutes.

### B. Standard of Constitutional Review

The initial issue which this Court must decide is whether the right of privacy implicated in this case as guaranteed by the Tennessee Constitution is broader than the right as guaranteed by the federal constitution and as construed by the United States Supreme Court. Implicit in this determination is whether the statutes at issue are to be judged under the less demanding undue burden standard, *see Casey*, 505 U.S. at 878, 112 S.Ct. at 2821, or the more stringent strict scrutiny standard. *See Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn.1993). Planned Parenthood argues that the state right to procreational autonomy is broader than the federal right and that the appropriate standard to apply is strict scrutiny. The State, on the other hand, asserts that the Court of Appeals correctly concluded that the appropriate standard to apply under the Tennessee Constitution is the "undue burden" standard adopted by the United States Supreme Court in *Casey*. *See* 505 U.S. at 874, 112 S.Ct. at 2819 ("Only where the state regulation imposes an undue burden on a woman's ability to make this decision [the decision of whether to undergo an abortion] does the power of the State reach into the heart of the liberty protected by the Due Process Clause").

---

**4.** Since their enactment, these provisions have been the subject of constitutional challenges in both state and federal court. *See Planned Parenthood of Memphis v. Blanton*, No. 78–2310 (W.D.Tenn. July 14, 1978) (continuing the temporary injunction against the waiting period requirements); *Planned Parenthood of Nashville, Inc. v. Alexander*, No.

79–843–II (Davidson Chanc. Oct. 19 & 24, 1979) (temporarily enjoining imposition of criminal penalties as related to informed consent and waiting period requirements); *Planned Parenthood of Memphis v. Alexander*, No. 78–2310 (W.D.Tenn. Mar. 23, 1981) (permanently enjoining enforcement of the 1978 waiting period statute).

### 1. United States Supreme Court Cases

In 1973, the United States Supreme Court first recognized a woman's right to terminate her pregnancy in *Roe v. Wade*, 410 U.S. at 153, 93 S.Ct. at 727. *Roe* involved a challenge to a Texas criminal abortion statute that criminalized all abortions except those necessary to preserve the life of the mother. In a plurality opinion, the Court concluded that the constitutional right of privacy encompassed a "woman's decision whether or not to terminate her pregnancy." *Id.* The Court also recognized that the State has "important interests in safeguarding health, in maintaining medical standards, and in protecting potential life" and that "[a]t some point in pregnancy, these respective interests become sufficiently compelling to sustain regulation...." *Id.* at 154, 93 S.Ct. at 727. Accordingly, the Court concluded that a woman's right to choose abortion is not absolute and "must be considered against important state interests in regulation." *Id.*

Reasoning that the State's interests become compelling at certain stages of pregnancy, the Court established a trimester framework by which to review states' abortion regulations in light of the competing interests. *Id.* at 163–64, 93 S.Ct. at 731–32. According to the Court, medical evidence indicates that before the end of the first trimester, childbirth presents greater risks to a woman's health than does abortion. *Id.* at 163, 93 S.Ct. at 732. Thus, the Court reasoned that the State's interest in maternal health becomes compelling after the first trimester, when the State may regulate abortion practice in ways reasonably related to protecting maternal health. *Id.* The Court reasoned further that at viability, the fetus is capable of sustaining life independent of the mother. *Id.* Accordingly, the Court held that the State's interest in potential life becomes compelling "at viability." *Id.* The Court held that the State "may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother." *Id.* at 163–64, 93 S.Ct. at 732. In *Roe*, a trimester framework was established pursuant to which the State's interest in maternal health becomes compelling at the end of the first trimester, and the State's interest in potential life becomes compelling at the point of viability. *Id.* at 163–64, 93 S.Ct. at 731–32.

After *Roe*, many states, including Tennessee, revised their criminal abortion statutes to account for *Roe's* trimester framework and a woman's constitutionally protected right to choose abortion. The United States Supreme Court decided several federal constitutional challenges to these newly enacted criminal abortion statutes.

Ten years after *Roe*, in *Akron v. Akron Ctr. for Reprod. Health*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), *overruled by Casey*, the Court reaffirmed *Roe* and struck down a second-trimester hospitalization requirement, physician-only informed consent requirements, a twenty-four hour waiting period requirement, a parental consent requirement, and an ordinance dealing with fetal remains. *Id.* at 452, 103 S.Ct. at 2504. Three members of the Court dissented, urging that the trimester framework of *Roe* be discarded and that the Court adopt the less restrictive "unduly burdensome" standard. *See id.* at 461, 103 S.Ct. at 2509 (O'Connor, J. joined by White and Rehnquist, JJ., dissenting).

In *Webster v. Reproductive Health Serv.*, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), the Court considered the constitutionality of the challenged portions of Missouri's abortion statutes, which provided: 1) that, as a preamble, each human's life begins at conception and that the state's laws should be interpreted to afford unborn children "all the rights, privileges, and immunities available to other persons, citizens, and residents;" 2) that public facilities and employees cannot be used for abortion services; and 3) that physicians conduct viability tests prior to

performing abortions.[5] A majority of the Court refused to pass on the constitutionality of the preamble but observed that a State has the authority to make a value judgment favoring childbirth over abortion, and that the "preamble can be read simply to express that sort of value judgment." *Id.* at 506, 109 S.Ct. at 3050. The majority also upheld the restrictions on the use of public facilities and employees. *Id.* at 511, 109 S.Ct. at 3053. The constitutionality of viability testing was sustained in an opinion authored by Chief Justice Rehnquist. *Id.* at 520, 109 S.Ct. at 3058. Justice Blackmun, joined by Justices Brennan and Marshall dissented from the views of the majority. *Id.* at 539, 109 S.Ct. at 3067 (Blackmun, J., concurring in part and dissenting in part). Justice Stevens dissented in a separate opinion. *Id.* at 560, 109 S.Ct. at 3079 (Stevens, J., concurring in part and dissenting in part). The dissenting justices, however, concurred in the Court's conclusion that the a provision regarding public funding was moot. *Id.* at 540, 109 S.Ct. at 3068, n. 1 and *id.* at 560, 109 S.Ct. at 3079.

Nineteen years after deciding *Roe*, the Court modified *Roe* in *Planned Parenthood v. Casey*. A majority of the Court reaffirmed *Roe's* holding that the Constitution protects a woman's right to terminate her pregnancy before viability without undue interference from the State. *Casey*, 505 U.S. at 846, 112 S.Ct. at 2804. After viability, the state has the power to restrict abortions "if the law contains exceptions for pregnancies which endanger the woman's life or health." *Id.*

Three justices concluded that the "undue burden standard is the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty." *Id.* at 876, 112 S .Ct. at 2820 (joint opinion of O'Connor, Kennedy and Souter, JJ.). According to the opinion, "[a] finding of an undue burden is a short-

hand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877, 112 S.Ct. at 2820. The Court upheld informed consent requirements, a twenty-four hour waiting period requirement, a parental consent requirement, a medical emergency exception to protect the mother's life and health, and most record keeping and reporting requirements. *Id.* at 880, 886–87, 899–901, 112 S.Ct. at 2822, 2825, 2826, 2832–33. It struck down a spousal notification requirement and related record keeping requirements. *Id.* at 898, 901, 112 S.Ct. at 2831, 2833.

Four justices, concurring in part and dissenting in part, criticized the undue burden test. The justices noted that the undue burden approach has no recognized basis in constitutional law. *Id .* at 964, 112 S.Ct. at 2866 (Rehnquist, C.J., joined by White, Scalia, and Thomas, JJ., concurring in part and dissenting in part). They also observed that the approach "is not built to last." *Id.* at 965, 112 S.Ct. at 2866. The test is based "on a judge's subjective determinations" and will allow judges to make decisions "guided only by their personal views." *Id.* They criticized the approach as being no "more workable than the trimester framework it discards." *Id.* at 966, 112 S.Ct. at 2866.

Most recently, in *Stenberg v. Carhart*, 530 U.S. 914, 120 S.Ct. 2597, 2617, 147 L.Ed.2d 743 (2000), a majority of the Court reaffirmed the "undue burden" standard. The Court struck down a statute banning partial birth abortions because it had no exception for the health of the mother and applied to dilation and evacuation abortions as well as to dilation and extraction abortions, thereby constituting an undue burden on the woman's ability to choose an abortion.

---

5. The Court also considered a ban on the use of public funds to encourage women to have more therapeutic abortions and determined that the issue was moot. *Webster,* 492 U.S. at 512–13, 109 S.Ct. at 3053–54.

Although the United States Supreme Court has now replaced the strict scrutiny standard in the abortion context with the less exacting undue burden standard, this action does not determine the standard which this Court must apply under the Tennessee Constitution. We now turn to the issue of the appropriate standard to apply under our state constitution.

### 2. Tennessee Cases

Though we have never before had the abortion issue squarely before us, we have considered the related issue of procreational autonomy. *Davis*, 842 S.W.2d at 600. In *Davis*, we first recognized a right to privacy under the Tennessee Constitution. *Id .; see also Hawk*, 855 S.W.2d at 577. *Davis* involved a divorce dispute over the disposition of seven frozen preembryos the parties had created during their marriage. The husband did not want to become a father outside of the marital relationship and therefore wanted the preembryos destroyed. The wife wanted to donate the preembryos to a childless couple. Our analysis of whether the parties would "become parents" turned on the exercise of the parties' constitutional right to privacy.

After observing that the right to privacy is not specifically mentioned in either the federal or the Tennessee constitutions, we initially reviewed the development of the federal right to privacy for guidance in interpreting our state constitution. *Davis*, 842 S.W.2d at 598–99. We noted that the United States Supreme Court has recognized a federal constitutional right of privacy despite the absence of specific language mentioning such a right in the United States Constitution. We reasoned that, likewise, the "right to privacy, or personal autonomy ..., while not mentioned explicitly in our state constitution,

is nevertheless reflected in several sections of the Tennessee Declaration of Rights...." *Id.* at 600. We further reasoned that the drafters of the Tennessee Constitution surely "foresaw the need to protect individuals from unwarranted governmental intrusion into matters ... involving intimate questions of personal and family concern." *Id.* We thus concluded that the Tennessee Constitution protects the individual's right to privacy and explained that:

> the specific individual freedom in dispute is the right to procreate. *In terms of the Tennessee state constitution,* we hold that the right of procreation is a vital part of an individual's right to privacy.

*Id.* (emphasis added). Accordingly, we explicitly relied on the Tennessee Constitution in *Davis* to extend protection to the husband's right to procreational autonomy.

Since the *Davis* decision, we have identified privacy rights in other contexts. We have held that a parent's right to the custody of his or her child implicates a fundamental right of privacy and may not be abridged absent a compelling state interest. *See Hawk*, 855 S.W.2d at 577; *Nale v. Robertson*, 871 S.W.2d 674, 680 (Tenn.1994); *Bond v. McKenzie (In re Adoption of Female Child)*, 896 S.W.2d 546, 547–48 (Tenn.1995); *Petrosky v. Keene*, 898 S.W.2d 726, 728 (Tenn.1995); *Tennessee Baptist Children's Homes, Inc. v. Swanson (In re Brittany Swanson)*, 2 S.W.3d 180, 187 (Tenn.1999). The Court of Appeals has relied upon *Davis* to find a privacy interest in consensual adult homosexuality. *See Campbell v. Sundquist*, 926 S.W.2d 250, 266 (Tenn.Ct.App.1996). There is no exhaustive list of activities that fall under the protection of the right to privacy, at either the federal or the state level.[6] However, it is clear that such activ-

---

6. As regards the federal level, the United States Supreme Court has afforded privacy protection to matters of marriage. *See Zablocki v. Redhail*, 434 U.S. 374, 383–86, 98 S.Ct. 673, 679–681, 54 L.Ed.2d 618 (1978)

(identifying right to marry as protected by right to privacy); *Boddie v. Connecticut*, 401 U.S. 371, 383, 91 S.Ct. 780, 789, 28 L.Ed.2d 113 (1971) (holding court may not deny dissolution of marriage to indigents solely based on

ities must be of the utmost personal and intimate concern.

We observe that expressly limiting the substantive scope of the interests comprising the right to privacy serves no helpful purpose, is indeed impossible, and is best left to constitutional amendment or interpretation of individual cases. Our task here is to determine whether the interest asserted in this case constitutes a cognizable privacy interest.

We hold that a woman's right to obtain a legal termination of her pregnancy is sufficiently similar in character to those personal and private decisions and activities identified in state and federal precedent to implicate a cognizable privacy interest.

### 3. Protections Afforded the Right to Privacy

Determining whether an asserted interest is fundamental is essential because fundamental rights receive special protection under both federal and state constitutions. Federal case law uniformly holds the gov-

ernment regulation of the exercise of fundamental rights is unconstitutional unless the regulations both serve a compelling governmental interest and are narrowly tailored to serve that interest. *See San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 29, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). Tennessee courts have adopted this "strict scrutiny" approach in regard to fundamental rights without exception. *See State v. Smoky Mountain Secrets, Inc.,* 937 S.W.2d 905, 911 (Tenn. 1996).

Under federal law, privacy interests involving matters of marriage, procreation, and child rearing have been held to be "fundamental" in nature. Fundamental rights have been described as "those liberties that are 'deeply rooted in this Nation's history and tradition.'" *Bowers v. Hardwick,* 478 U.S. 186, 192, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986) (quoting *Moore v. City of E. Cleveland,* 431 U.S. at 503, 97 S.Ct. at 1938)). They have also been described as those rights that are "'implicit in the concept of ordered liber-

failure to pay filing fees); *Loving v. Virginia,* 388 U.S. 1, 11–12, 87 S.Ct. 1817, 1823–24, 18 L.Ed.2d 1010 (1967) (invalidating statute prohibiting interracial marriage); *Griswold v. Connecticut,* 381 U.S. 479, 485–86, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965) (finding law prohibiting use of contraceptives to violate right of marital privacy).

Individual choices regarding family and child rearing also fall under the right to privacy. *See Moore v. City of E. Cleveland,* 431 U.S. 494, 506, 97 S.Ct. 1932, 1939, 52 L.Ed.2d 531 (1977) (plurality opinion) (invalidating zoning ordinance that essentially prohibited living with extended family); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925) (invalidating law requiring children to attend public schools instead of, as parents wished, private school); *Meyer v. Nebraska,* 262 U.S. 390, 403, 43 S.Ct. 625, 628, 67 L.Ed. 1042 (1923) (invalidating law which prohibited the teaching of foreign languages to children in spite of parents wishes).

Matters regarding procreation implicate the right to privacy. *See Carey v. Population Servs. Int'l,* 431 U.S. 678, 690–91, 97 S.Ct. 2010, 2018–19, 52 L.Ed.2d 675 (1977) (invalidating statute prohibiting sale of nonmedical

contraceptives by non-pharmacists); *Roe v. Wade,* 410 U.S. at 164, 93 S.Ct. at 732 (1973) (invalidating laws prohibiting abortion); *Eisenstadt v. Baird,* 405 U.S. 438, 454–55, 92 S.Ct. 1029, 1039, 31 L.Ed.2d 349 (1972) (invalidating laws prohibiting sale of contraceptives to unmarried persons); *Griswold v. Connecticut,* 381 U.S. at 485–86, 85 S.Ct. at 1682 (1965); *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942) (invalidating mandatory sterilization plan of certain convicted felons).

Also, to some degree, matters regarding bodily integrity and personal autonomy implicate privacy interests. *See Planned Parenthood of Cent. Mo. v. Danforth,* 428 U.S. 52, 71, 96 S.Ct. 2831, 2842, 49 L.Ed.2d 788 (1976) (invalidating spousal consent provision of abortion statutes stating, "Inasmuch as it is the woman who physically bears the child and who is the more directly and immediately affected by the pregnancy, as between the [woman and her husband], the balance weighs in her favor."); cf. *Rochin v. California,* 342 U.S. 165, 174, 72 S.Ct. 205, 210–211, 96 L.Ed. 183 (1952) (finding due process violation from law enforcement's invasion of a defendant's body to obtain inculpatory evidence).

ty,' such that 'neither liberty nor justice would exist if [they] were sacrificed.'" *Bowers*, 478 U.S. at 191–92, 106 S.Ct. at 2844 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325–26, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), *overruled by Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *accord Roe*, 410 U.S. at 152, 93 S.Ct. at 726. Additionally, fundamental rights have been found to be those rights "explicitly or implicitly guaranteed by the Constitution." *Rodriguez*, 411 U.S. at 33–34, 93 S.Ct. at 1297 (context of equal protection challenge).

Nevertheless, in *Davis*, we found the right to procreational autonomy to be "inherent in our most basic concepts of liberty." *Davis*, 842 S.W.2d at 601. That test was essentially a restatement of the fundamental rights approach of *Roe*. Because a woman's right to terminate her pregnancy and an individual's right to procreational autonomy are similar in nature, we find the *Davis* test to be most appropriate here.[7] Thus, a woman's right to terminate her pregnancy is fundamental if it can be said to be inherent in the concept of ordered liberty embodied in the Tennessee Constitution.

The dissent contends that the right to terminate a pregnancy as guaranteed by the Tennessee Constitution is co-extensive with the similar right as guaranteed by the United States Constitution, and this Court should follow the pronouncement of the United States Supreme Court as to the appropriate standard on which to judge abortion regulations. *See Casey*, 505 U.S. at 876, 112 S.Ct. at 2820. The dissent's primary contention in this regard is that the historical backgrounds of the federal due process clauses and the "Law of the Land" clause in the Tennessee Constitution (Tenn. Const. art. I, § 8) are similar and that the textual differences of the clauses should be accorded little weight. The dissent also contends that historically the courts of this State have consistently viewed the "Law of the Land" clause as providing co-extensive protection to personal liberty as that provided by the federal due process clauses.

Without question, the protections afforded Tennessee citizens by the Tennessee Constitution's Declaration of Rights share the contours of the protections afforded by the United States Constitution's Bill of Rights. *See Davis*, 842 S.W.2d at 600. This is due, in large part, to affinity of purpose. Both documents were written with the intent to reserve to the people various liberties and to protect the free exercise of those liberties from governmental intrusion.

It is also due in part to the Supremacy Clause of the United States Constitution, which provides that the federal constitution is the ultimate "Law of the Land." *See* U.S. Const. art. VI, cl. 2. It essentially mandates that no Tennessee law, whether statute, rule, or constitution, may operate to deprive a Tennessean any right afforded by the federal constitution. *See Miller v. State*, 584 S.W.2d 758, 760 (Tenn.1979).

Therefore, Tennessee courts are rightfully reluctant to find greater protection from the text of the state constitution where the protections of the federal constitution suffice. As a result, more interpretive case law is generated in regard to the federal constitution. *See* Richard S. Wirtz, *Foreward: Interpreting the Tennessee Constitution*, 61 Tenn.L.Rev. 405, 406 (1994). Therefore, analysis of case law interpreting the federal constitution is often a first step in interpreting provisions of our own constitution that are similar in wording, intent, or purpose.

It is equally without question, however, that the provisions of our Tennessee Declaration of Rights from which the right to privacy emanates differ from the federal Bill of Rights in marked respects. In

---

7. Our holding does no violence to previous Tennessee privacy cases that have applied different tests for determining whether a privacy interest rose to the level of a fundamental right. Different tests may be warranted in different contexts.

*Davis,* we found that the right to privacy guaranteed by the Tennessee Constitution sprang from the express grants of rights in Article I, sections 3, 7, 19, and 27, and also from the grants of liberty in Article I, sections 1, 2, and 8. *See Davis,* 842 S.W.2d at 599–600.

These protections contained in our Declaration of Rights are more particularly stated than those stated in the federal Bill of Rights. For example, the explicit guarantee of freedom of worship found under the United States Constitution occupies but sixteen words in an amendment generally guaranteeing freedom of worship, freedom of speech, freedom of the press, the right to assemble, and the right to petition the government for redress of grievances. *See* U.S. Const. amend. I.

In contrast, the guarantee of worship under the Tennessee Constitution exists in its own paragraph constituting eighty-one words. It characterizes mankind's right to worship as "a natural and indefeasible right" and declares "that no human authority can, in any case whatever, control or interfere with the rights of conscience." Tenn. Const. art I, § 3. This Court has said that the language of this section, when compared to the guarantee of religious freedom contained in the federal constitution, is a stronger guarantee of religious freedom. *See Carden v. Bland,* 199 Tenn. 665, 288 S.W.2d 718, 721 (1956).

Tennessee's guarantees of free speech and free press are similarly more descriptive than the federal grant. The verbal expression of these basic freedoms in our constitution is infused with a strong sense of individuality and personal liberty: "The free communication of thoughts and opinions, is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty." Tenn. Const. art. I, § 19.

While these differences in language and expression have yet to give rise to recognition of a substantial difference in protection of speech, this Court has not foreclos-ed the possibility that our constitution might offer greater protection to speech in certain contexts. *See, e.g., Davis–Kidd Booksellers,* 866 S.W.2d at 525 (noting finding coextensive protection in obscenity context does not mean provisions are "identical" for all purposes); *Leech v. American Booksellers Ass'n, Inc.,* 582 S.W.2d 738, 745 (Tenn.1979) (holding Art. I, § 19 "should be construed to have a scope *at least* as broad as that afforded those freedoms by the first amendment of the United States Constitution" (emphasis added)). That this Court has seen fit to leave this door open speaks of our recognition of a potentially greater state protection.

Some of our constitutional protections have been found to be "identical" to provisions of the United States Constitution in some respects. For example, this Court held in *Sneed v. State,* 221 Tenn. 6, 423 S.W.2d 857 (1968) that the Tennessee constitutional prohibition against unreasonable searches and seizures "is identical in intent and purpose" to the Fourth Amendment of the federal constitution. *Id.* at 860.

Identity in intent and purpose, however, does not necessarily correlate to coextensive degrees of protection. In fact, this Court's "decisions applying the state constitution have been somewhat more restrictive than comparable federal cases" in some search and seizure contexts. *State v. Lakin,* 588 S.W.2d 544, 548 (Tenn.1979) (finding Tenn. Const. art. I, § 7 offered greater protection than U.S. Const. amend. IV in context of "open fields doctrine"); *see also State v. Doelman,* 620 S.W.2d 96, 99 (Tenn.Crim.App.1981) (noting "the Tennessee Constitution is somewhat more protective of private property rights").

This difference in degree of protection afforded by the state and federal constitutions was due primarily to an explicit difference in wording between the two constitutional provisions. Article I, section 7 of

the Tennessee Constitution protects "possessions," a term not mentioned in the Fourth Amendment to the United States Constitution. *See Lakin,* 588 S.W.2d at 549 (construing protection of "possessions" to include occupied, fenced areas); *see also Welch v. State,* 154 Tenn. 60, 64, 289 S.W. 510, 511 (1926).

We do not mean to suggest a qualitative difference in constitutional provisions simply because of a mere quantitative difference in words. Nor do we suggest that different expressions of intent preclude that intent being identical. *Cf. Delk v. State,* 590 S.W.2d 435, 440 (Tenn.1979) (stating, "We do not agree that the Tennessee prohibition against self-incrimination is broader or different in any application thereof because of the use of the word 'evidence' instead of the word 'witness' ").

■ Still, this Court is not free to discount the fact that the framers of our state constitution used language different from that used by the framers of the United States Constitution. No words in our constitution can properly be said to be surplusage, *see Welch,* 154 Tenn. at 62, 289 S.W. at 510 ("[T]he word 'possessions' was added [to our Constitution] for a purpose."), and differences in expressions of right are particularly relevant to determining the "concept of liberty" embodied in our constitution.

Our constitution also contains specific provisions not found in the federal constitution, the most pertinent being Article 1, section 2, condemning the doctrine of non-resistance. This provision exemplifies the strong and unique concept of liberty embodied in our constitution in that it "clearly assert[s] the right of revolution." Otis H. Stephens, Jr., *The Tennessee Constitution and the Dynamics of American Federalism,* 61 Tenn.L.Rev. 707, 710 (1994). It provides: "That government being instituted for the common benefit, the doctrine

of non-resistance against arbitrary power and oppression is absurd, slavish, and destructive of the good and happiness of mankind." Tenn. Const. art. I, § 2. In essence, this section recognizes that our government serves at the will of the people of Tennessee, and expressly advocates active resistence against the government when government no longer functions to serve the people's needs. There is no better statement of our constitution's concept of liberty than this audacious empowerment of Tennesseans to forcibly dissolve the very government established but one Article later in our constitution.

That the protections afforded by some of these express provisions, including the "Law of the Land" clause, have been found to be "practically synonymous" with their federal counterparts is not dispositive of the issue of whether the collective concept of liberty embodied in our constitution is greater than the concept envisioned by the federal constitution. Indeed, this Court has recognized that practical synonymity does not necessarily correspond to coextensive expressions of liberty, even as to individual express guarantees under the constitution. For example, in *Carden v. Bland,* 199 Tenn. at 672, 288 S.W.2d at 721, we held that the freedom of worship clauses in the Tennessee and federal Constitutions are "practically synonymous." Still, in that same breath, the Court noted, "If anything, our own organic law is broader and more comprehensive in its guarantee of freedom of worship and freedom of conscience...." *Id.*

■ Today, we remain opposed to any assertion that previous decisions suggesting that synonymity or identity of portions of our constitution and the federal constitution requires *this* Court to interpret our constitution as coextensive to the United States Constitution.[8] "Tennessee constitu-

---

8. The dissent misinterprets our holding in this regard. It states that "the Court has even declared today that it 'remains opposed' to any assertion that prior cases interpreting our

constitution should control the outcome of this case." We do not suggest that precedent has no value in interpreting our constitution. The fact, however, that previous decisions

tional standards are not destined to walk in lock step with the uncertain and fluctuating federal standards and do not relegate Tennessee citizens to the lowest levels of constitutional protection, those guaranteed by the national constitution." *State v. Black*, 815 S.W.2d 166, 193 (Tenn.1991) (Reid, C.J., concurring in part and dissenting in part). We have said time and again that:

> [A]s to Tennessee's Constitution, we sit as a court of last resort, subject solely to the qualification that we may not impinge upon the minimum level of protection established by Supreme Court interpretations of the federal constitutional guarantees. But state supreme courts, interpreting state constitutional provisions, may impose higher standards and stronger protections than those set by the federal constitution. It is settled law that the Supreme Court of a state has full and final power to determine the constitutionality of a state statute, procedure, or course of conduct with regard to the state constitution, and this is true even where the state and federal constitutions contain *similar or identical provisions*.

*Miller v. State*, 584 S.W.2d at 760 (emphasis added). We do not intend to divert from this principle.

■ The concept of ordered liberty embodied in our constitution requires our finding that a woman's right to legally terminate her pregnancy is fundamental. The provisions of the Tennessee Constitution imply protection of an individual's right to make inherently personal decisions, and to act on those decisions, without government interference. A woman's termination of her pregnancy is just such an inherently intimate and personal enterprise. This privacy interest is closely aligned with matters of marriage, child

rearing, and other procreational interests that have previously been held to be fundamental. To distinguish it as somehow non-fundamental would require this Court to ignore the obvious corollary.

### 4. The Appropriate Standard

■ It is well settled that where a fundamental right is at issue, in order for a state regulation which interferes with that right to be upheld, the regulation must withstand strict scrutiny. The State's interest must be sufficiently compelling in order to overcome the fundamental nature of the right. *See State v. Smoky Mountain Secrets*, 937 S.W.2d at 910–11; *Hawk* 855 S.W.2d at 579 n. 9 (citing *Davis* for the proposition that the state's interest must be sufficiently compelling to overcome a fundamental right, *Davis*, 842 S.W.2d at 602.). *See also Valley Hosp. Ass'n v. Mat–Su Coalition for Choice*, 948 P.2d 963, 969 (Alaska 1997); *American Academy of Pediatrics v. Lungren*, 66 Cal. Rptr.2d 210, 231, 16 Cal.4th 307, 340–41, 940 P.2d 797, 819 (1997) (plurality opinion); *Women of the State of Minn. v. Gomez*, 542 N.W.2d 17, 31 (Minn.1995); *Florida v. Presidential Women's Ctr.*, 707 So.2d 1145, 1149 (Fla.Dist.Ct.App.1998).

Other jurisdictions have applied heightened scrutiny of governmental regulation of abortion since *Casey* was decided. Our rejection of the *Casey* standard is similar to the action taken by those state courts. In *Women of the State of Minn. v. Gomez*, the Minnesota Supreme Court considered a complaint for declaratory and injunctive relief challenging the constitutionality of statutes restricting the use of public medical assistance and general assistance funds for abortions. The Court determined that the Minnesota Constitution guaranteed a right of privacy rooted in several provisions of the constitution, including a due process provision, a "law of the land" pro-

---

have held that our constitutional provisions are synonymous with their federal counterparts does not mean that we are not free to interpret the provisions of our constitution with respect to a particular right in such a way as to give stronger protection to individual liberties.

vision, and a provision protecting against unreasonable searches and seizures. *Gomez*, 542 N.W.2d at 27 n. 10. The Court held that the right of privacy includes a woman's right to choose to have an abortion. *Id.* at 27. Stating that it could think of few decisions more intimate, personal, and profound than a woman's decision between childbirth and abortion, it held that the case was one of those limited circumstances in which it would interpret the Minnesota Constitution to provide more protection than that afforded under the federal constitution. *Id.* at 27, 30. It subjected the regulations to strict scrutiny because the right of privacy is fundamental. *Id.* at 31. *See also Planned Parenthood League of Massachusetts, Inc. v. Attorney General,* 424 Mass. 586, 590, 677 N.E.2d 101, 104 (1997) (holding that the state constitution Declaration of Rights afforded greater degree of protection to the right asserted than did the federal constitution as interpreted by the United States Supreme Court).

The application of the strict scrutiny approach is entirely consistent with our jurisprudence considering laws which impose upon or restrict fundamental rights. While the joint opinion in *Casey* adopted the "undue burden" approach, Justice Scalia in a separate dissent and concurrence criticized the so-called standard as being "ultimately standardless." 505 U.S. at 987, 112 S.Ct. at 2878 (Scalia, J. dissenting and concurring). He noted that the undue burden standard was "created largely out of whole cloth" and essentially had no recognized basis in constitutional law. *Id.* (referring to Rehnquist, C.J. concurring and dissenting, *Id.* at 964, 112 S.Ct. at 2866.)

We agree that the undue burden approach is essentially no standard at all,

and, in effect, allows judges to impose their own subjective views of the propriety of the legislation in question. The dissent has criticized the majority for "convert[ing] itself into a roving constitutional convention which is free to strike down the duly enacted laws of the legislature for no other reason than the Court feels they are burdensome and unwise." In fact, that is exactly what the undue burden approach allows. Under that test, the Court is free to determine, under the justices' own subjective opinions as to the wisdom of the legislation, whether the legislation creates an undue burden upon a woman's right to terminate her pregnancy. Application of strict scrutiny, a recognized principle of constitutional law, on the other hand, requires the Court to apply a standard that has been applied repeatedly over the years, and the Court may draw upon that precedent in determining whether the legislation passes muster.

The subjective nature of the undue burden analysis is aptly illustrated by the fact that the majority and the dissent reach diametrically opposed results when applying the analysis. The majority would find each of the challenged abortion statutes to be unconstitutional under *Casey,* while the dissent, applying exactly the same analysis, would reach the opposite result as to each statute, save one.[9]

The undue burden test requires a judge to consider only the effect of the governmental regulation. It fails, however, to offer an objective standard by which the effect should be judged. Accordingly, a regulation held to be an undue burden by one judge could just as easily be found to be reasonable by another judge because the gauge for what is an undue burden necessarily varies from person to person.

**9.** The dissent criticizes this Court's "undue burden" analysis by stating that the Court has cited no legal authority or analysis in reaching the conclusion that the challenged regulations are unconstitutional under the "undue burden" test. However, we have indeed conducted an analysis focusing upon whether the effect of the regulation creates an undue burden upon the person seeking an abortion. Moreover, the only "legal authority" which need be cited is the *Casey* opinion since it presumably sets forth the standard and the analysis which must be followed if the "undue burden" test is followed.

Thus, the *Casey* test offers our judges no real guidance and engenders no expectation among the citizenry that governmental regulation of abortion will be objective, evenhanded, or well-reasoned. This Court finds no justification for exchanging the long established constitutional doctrine of strict scrutiny for a test, not yet ten years old and applicable to a single, narrow area of the law, that would relegate a fundamental right of the citizens of Tennessee to the personal caprice of an individual judge.

It may be appropriate in some areas of our law to provide judges individual, and necessarily subjective, discretion. Subjective judicial opinion has no place, however, in determining the constitutionality of the exercise of fundamental rights. Accordingly, we conclude that strict scrutiny is the appropriate standard to apply in this case.

### 5. Application of Strict Scrutiny

The next critical inquiry in our review is the nature of the State's interests and when each of the respective interests becomes compelling. In our view, the State has an interest in promoting the health and safety of all its citizens, and the State clearly has a compelling interest in maternal health from the beginning of pregnancy. Tenn. Const. art. I, § 1 (stating that the government is "instituted for [the] peace, safety and happiness" of its citizens); *but see Roe*, 410 U.S. at 163, 93 S.Ct. at 731 ("With respect to the State's important and legitimate interest in the health of the mother, the 'compelling' point, in the light of present medical knowledge, is at approximately the end of the first trimester.").

In *Davis*, we discussed the State's interest in potential life. There, we were concerned with the State's interest in the potential life of the four- to eight-cell preembryos, and we ultimately concluded that the State's interest in potential life was insufficient to permit an infringement on the parties' procreational autonomy.

*Davis*, 842 S.W.2d at 602. We reviewed our state statutes which deal with potential human life and noted that Tenn.Code Ann. § 20–5–106(b) (1980) allowed a civil action for wrongful death of a *viable* fetus. *Davis*, 842 S.W.2d at 602 n. 26 (emphasis added). We further noted that pursuant to Tenn.Code Ann. §§ 39–13–107 and –214 (1991), a person cannot commit a criminal offense against a fetus unless the fetus is *viable*. *Id.* Finally, we reviewed the trimester framework of our criminal abortion statutes. We reasoned that:

> Taken collectively, our statutes reflect the policy decision that, at least in some circumstances, the interest of living individuals in avoiding procreation is sufficient to justify taking steps to terminate the procreational process, despite the state's interest in potential life.

*Id.* We thus concluded that the State's interest in the four- to eight-cell preembryos was "at best slight" and indicated that viability marks a critical developmental point in a woman's pregnancy. *Id.* at 602, 602 n. 26.

We further noted in *Davis* that the "abortion statute reveals that the increase in the state's interest is marked by each successive developmental stage...." *Id.* at 602. It follows that as the pregnancy progresses, the State's interest in potential life gradually increases and gradually comes into conflict with the woman's interest in procreational autonomy. In our view, therefore, it is clear that at some developmental point in the woman's pregnancy, the State's interest in potential life becomes compelling, and the woman's interest in procreational autonomy must yield to the State's interest. *See id.* at 602 n. 26; Tenn.Code Ann. § 20–5–106(c) (Supp.1999); Tenn.Code Ann. §§ 39–13–107 and –214 (1997). Accordingly, we hold that the State's interest in potential life becomes compelling at viability. Bearing these constitutional standards in mind, we now consider the challenged provisions.

### C. Analysis of Tennessee's Criminal Abortion Statutes

#### 1. Tenn.Code Ann. § 39–15–201

The Tennessee statute initially provides that abortions are lawful within the first three months of pregnancy if performed with the woman's consent and in accordance with the medical judgment of her attending physician. Tennessee Code Ann. § 39–15–201(c)(2) further provides that "[n]o person is guilty of a criminal abortion" ... when an abortion ... is performed under the following circumstances:

> . . . .
>
> After three (3) months, but before viability of the fetus, if the abortion or attempt to procure a miscarriage is performed with the pregnant woman's consent and in a hospital. . . .

Tenn.Code Ann. § 39–15–201(c)(2). There is no statutory provision for a medical emergency exception to the second trimester hospitalization requirement. *See* Tenn. Code Ann. §§ 39–15–201 through 209.

The trial court construed the term "hospital" to include "ambulatory surgical centers," bringing the statute into conformity with the standards of the American College of Obstetricians and Gynecologists, and upheld the second trimester hospitalization requirement. The Court of Appeals applied the undue burden standard and concluded that there was no evidence of improper legislative motive nor evidence that the second trimester hospitalization requirement created a substantial obstacle preventing women from obtaining abortions.

 Under the strict scrutiny standard, it is the State's burden to show that the regulation is justified by a compelling state interest and narrowly tailored to achieve that interest. *E.g., Smoky Mountain Secrets*, 937 S.W.2d at 912; *Hawk*, 855 S.W.2d at 579 n. 9. The State concedes that the hospitalization requirement increases the cost of abortions. The State, however, points to evidence in the record that second trimester abortions can result in complications and argues that such complications require a hospital setting for a proper medical response. The State presented testimony that Planned Parenthood's facilities lack necessary instruments, equipment, and supplies to perform abortions after the third month of pregnancy. In light of this evidence, the State argues that the second trimester hospitalization requirement is necessary to protect maternal health. Planned Parenthood points to evidence that second trimester abortions are safe outside the hospital setting up to eighteen weeks of pregnancy and that the hospitalization requirement only serves to increase the cost of second trimester abortions without increasing their safety. The State insists, however, that freestanding outpatient clinics and ambulatory treatment centers like those run by the plaintiffs lack adequate facilities in which to perform second trimester abortions.

Although the State has a compelling interest in maternal health from the beginning of pregnancy, Tenn. Const. art. I, § 1, the second trimester hospitalization requirement is not narrowly tailored to further that state interest. Substantial evidence was introduced at trial to indicate that abortions can be performed safely outside the hospital setting through at least the first eighteen weeks of pregnancy. American College of Obstetricians and Gynecologists, *Standards for Obstetric–Gynecologic Services* (7th ed.1989). As observed by the Court of Appeals, a general agreement exists within the medical community that abortions can be performed safely in physicians' offices and outpatient clinics through the fourteenth week of pregnancy and, further, that physicians agree that abortions through the eighteenth week of pregnancy may be performed safely in free-standing surgical facilities. As noted by the trial court, the evidence is clear that second-trimester abortions are performed in the Nashville community in " 'ambulatory surgical cen-

ters,' which have resulted from advanced medical technology and care, and are also the product of an attempt to lower costs to patients."

■ The State may, of course, adopt standards for licensing facilities where second trimester abortions may be performed such as requiring facilities to be properly equipped and staffed. *See, e.g.,* American College of Obstetricians and Gynecologists, *Standards for Obstetric–Gynecologic Services* (setting forth suggested qualification standards). However, the State may not simply prohibit all second trimester abortions that are not performed in a hospital. Such a regulation is not narrowly tailored to promote maternal health.

Moreover, in light of the complete absence of a medical emergency exception to the hospitalization requirement, the provision is constitutionally infirm even under the federal undue burden standard. *Casey,* 505 U.S. at 879, 112 S.Ct. at 2821 ("[T]he state ... may, if it chooses, regulate, and even proscribe, abortion *except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.*" (quoting *Roe,* 410 U.S. at 164–65, 93 S.Ct. at 732) (emphasis added)). Accordingly, we conclude that the second trimester hospitalization requirement "place[s] a substantial obstacle in the path of a woman seeking an abortion." *Id.* at 878, 112 S.Ct. at 2821.

### 2. Tenn.Code Ann. § 39–15–202

We now turn to consider the statutory provisions that set out the informed consent requirements, the two-day waiting period requirement, and the medical emergency exceptions to each of these requirements. Because each of these provisions are interrelated, and the lower courts considered the combined effect of these subsections, we too will consider them together.

The informed consent requirements are codified at Tenn.Code Ann. § 39–15–202(b)(c). Subsection 202(b) states:

(b) In order to ensure that a consent for an abortion is truly informed consent, an abortion shall be performed or induced upon a pregnant woman only after she has been orally informed by her attending physician of the following facts and has signed a consent form acknowledging that she has been informed as follows:

(1) That according to the best judgment of her attending physician she is pregnant;

(2) The number of weeks elapsed from the probable time of the conception of her unborn child, based upon the information provided by her as to the time of her last menstrual period or after a history, physical examination, and appropriate laboratory tests;

(3) That if more than twenty-four (24) weeks have elapsed from the time of conception, her child may be viable, that is, capable of surviving outside of the womb, and that if such child is prematurely born alive in the course of an abortion her attending physician has a legal obligation to take steps to preserve the life and health of the child.

. . .

(5) That numerous public and private agencies and services are available to assist her during her pregnancy and after the birth of her child, if she chooses not to have the abortion, whether she wishes to keep her child or place the child for adoption, and that her physician will provide her with a list of such agencies and the services available if she so requests; or

(6) Numerous benefits and risks are attendant either to continued pregnancy and childbirth or to abortion depending upon the circumstances in which the patient might find herself. The physician shall explain these benefits and risks to the best of such physician's ability and knowledge of the circumstances involved.

Subsection 202(c) states:

At the same time the attending physician provides the information required by subsection (b), such physician shall inform the pregnant woman of the particular risks associated with her pregnancy and childbirth and the abortion or child delivery technique to be employed, including providing her with at least a general description of the medical instructions to be followed subsequent to the abortion or childbirth in order to ensure her safe recovery.

*Id.* § 202(b)-(c).[10] These provisions apply to any abortion sought in Tennessee, regardless of the trimester in which it is sought.

The two-day waiting period requirement is codified at Tenn.Code Ann. § 39–15–202(d)(1). This subsection states:

> There shall be a two-day waiting period after the physician provides the required information, excluding the day on which such information was given. On the third day following the day such information was given, the patient may return to the physician and sign a consent form.

*Id.* § 202(d)(1). Thus, after the woman receives the mandated information, she must wait two additional days before she "may return" to the physician, sign a consent form, and obtain the abortion.

Finally, the emergency medical exceptions to both these sections are codified at Tenn.Code Ann. § 39–15–202(d)(3), (g). Subsection 202(d)(3) provides the medical emergency exception to the two-day waiting period requirement and states:

> This subsection shall not apply when the attending physician, utilizing experience, judgment or professional competence, determines that a two-day waiting period or any waiting period would *endanger the life* of the pregnant women.... This provision shall not relieve the attending physician of

his duty to the pregnant woman to inform her of the facts under subsection (b).

*Id.* § 202(d)(3) (emphasis added). Subsection 202(g) contains the medical emergency exceptions to all requirements of Tenn. Code Ann. § 39–15–202 and states:

> The provisions of this section shall not apply in those situations where an abortion is certified by a licensed physician as *necessary to preserve the life* of the pregnant woman.

*Id.* § 202(g) (emphasis added). These are the only medical emergency exceptions to the challenged statutory provisions before this Court.

The trial court found that the attending physician need not personally inform the pregnant woman of the required information, but must verify that such counseling has taken place and confirm that the patient is "actually supplied adequate information to enable her to make an autonomous decision." The trial court, however, struck the waiting period requirement. Finally, as to the medical emergency exceptions, the trial court interpreted the word "life" to mean "life and health" and upheld the exceptions.

Although the Court of Appeals generally affirmed the trial court with regard to the informed consent provisions, the appellate court disagreed with the trial court's conclusion that the waiting period created an undue burden. The intermediate court expressed concern that its research had failed to reveal a single case upholding a waiting period longer than twenty-four hours, but the court declined to strike the statute based solely on the length of the waiting period. The Court of Appeals did conclude, however, that under the facts of this case, the combined effect of the physician-only counseling requirement and the mandatory two-day

---

**10.** The lower courts held unconstitutional § 202(b)(4), the informed consent subsection requiring physicians to inform patients that "abortion in a considerable number of cases constitutes a major surgical procedure." The State has not appealed that holding, and that subsection is not before us.

waiting period unduly burdens a woman's exercise of her procreational rights. The court disagreed with the trial court's analysis concerning the attending physician requirement, stating that pursuant to the plain language of the statute, a physician may not delegate his or her informed consent obligations to any other person. Finally, the court disagreed with the trial court's construction of the medical emergency exception contained in Tenn.Code Ann. § 39–15–202(g), reasoning that pursuant to the plain meaning of § 202(g), a physician may bypass the requirements of Tenn.Code Ann. § 39–15–202 only when "necessary to preserve the life of the pregnant woman," regardless of her health. Accordingly, the appellate court held the medical emergency exceptions to be unconstitutional under *Casey*.

It is the State's burden to show that the regulation is justified by a compelling state interest. *E.g., Smoky Mountain Secrets,* 937 S.W.2d at 912; *Hawk,* 855 S.W.2d at 579 n. 9. The State, however, has chosen to primarily argue that the Court of Appeals was correct in reviewing the challenged provisions under the undue burden standard announced in *Casey.* Planned Parenthood, on the other hand, argues that none of these provisions are narrowly tailored to further compelling state interests.

### a. Informed Consent and Physician–Only Counseling Requirements

▇▇▇ Planned Parenthood challenged the statutory requirement that before a woman consents to an abortion, her attending physician must orally inform her of certain information about the procedure and her options. Tenn.Code Ann. § 39–15–202(b) and (c). The legislature has spoken on the issue of informed consent in another context. Tenn.Code Ann. § 29–26–118. This section applies to all other actions involving the issue of informed consent except for abortion. Section 29–26–118, captioned "Proving inadequacy of consent," provides that a plaintiff to a malpractice action proves lack of informed consent by presenting evidence that the physician "did not supply appropriate information to the patient in obtaining his informed consent ... in accordance with the recognized standard of acceptable professional practice in the profession and in the speciality, if any ..." *Id.* The legislature has provided for a cause of action based on the lack of informed consent and has recognized that informed consent is intended to benefit the patient, i.e., the pregnant woman. *Accord, e.g., Bryant v. HCA Health Services of Tennessee, Inc.,* 15 S.W.3d 804, 809–10 (Tenn.2000).

Although it is important that a woman contemplating abortion be informed "in accordance with the recognized standard of acceptable professional practice," the physician-only counseling requirement is not narrowly tailored to accomplish this requirement. The State argues that medical ethics require the attending physician to impart the required information to the woman. The State suggests that nothing in the statute prevents the attending physician from informing the woman of the required information over the telephone, thereby reducing any burden which could result from the combined effect of the physician-only counseling requirement and the two-day waiting period requirement. In our view, however, this interpretation disregards the plain language contained in Tenn.Code Ann. § 39–15–202(d)(1) that a woman "may return" to the physician's office following the two-day waiting period. In requiring that a woman wait two days before she "may return" to her physician, *id.,* the legislature clearly intended that the woman make two trips to the physician in order to fulfill the informed consent requirements.

In any event, the State maintains that these provisions are constitutionally sound, pointing to evidence in the record that Planned Parenthood has been providing similar information to its patients. Medical experts for Planned Parenthood testified that most women have already made up their minds before going to the abor-

tion provider, and for those who seem uncertain upon arrival, that doctors either discuss the matter further or will not perform the abortion. Moreover, evidence indicates that it is standard throughout the medical community for health care professionals other than the attending physician to provide needed counseling and that the attending physician's role should be to ensure that the patient has received appropriate information. *See also Akron*, 462 U.S. at 448, 103 S.Ct. at 2502 ("The State's interest is in ensuring that the woman's consent is informed and unpressured; the critical factor is whether she obtains the necessary information and counseling from a qualified person, not the identity of the person from whom she obtains it."). Because it is not necessary that the physician personally impart the required information to the woman in order for informed consent to occur, the physician-only counseling requirement is not narrowly tailored to further a compelling state interest and will not be upheld.

We likewise conclude that the physician-only counseling requirement cannot be upheld, even under the less exacting undue burden analysis. Because the information may be provided to the woman contemplating abortion by another health care professional and the same result be achieved, we can only conclude that the purpose or effect of the physician-only requirement is to "place a substantial obstacle in the path of a woman seeking an abortion." *Casey*, 505 U.S. at 878, 112 S.Ct. at 2821.

■ Our analysis of the physician-only counseling requirement, as well as the lower court's conclusion and the State's concession that § 39–15–202(b)(4) ("[t]hat abortion in a considerable number of cases constitutes a major surgical procedure") is unconstitutional, pretermits our discussion of each of the informed consent provisions

individually. We decline to simply elide those portions of subsections (b) and (c) relating to the specific information the woman is to be told. *See State ex rel. Barker v. Harmon*, 882 S.W.2d 352, 353 (Tenn.1994). In *Harmon*, we explained that "[t]he doctrine of elision allows a court, under appropriate circumstances when consistent with the expressed legislative intent, to elide an unconstitutional portion of a statute and find the remaining provisions to be constitutional and effective." *Id.* at 355. Even though the General Assembly included a severability clause when the statutes were recodified in 1989, 1989 Tenn.Pub. Acts, ch. 591, § 120, the State's arguments have not only stressed the importance of having the physician personally inform the woman but have further insisted that medical ethics *require* the physician to inform the woman. Accordingly, we conclude that the legislature would not have enacted the informed consent provisions in absence of the physician-only counseling requirement, and that consequently, the doctrine of elision cannot apply to save the remaining informed consent provisions.[11]

### b. Mandatory Waiting Period Requirement

■ We further conclude that the two-day waiting period requirement contained in Tenn.Code Ann. § 39–15–202(d)(1) fails to pass constitutional muster. The State appears to argue that the waiting period requirement furthers its interest in potential life and explicitly argues that this provision protects maternal health by ensuring that the woman has adequate time to reflect on her decision after hearing the statutorily prescribed information. The State has not argued that the waiting period provision is narrowly tailored to further a compelling state interest, but instead points to evidence that while the waiting

---

11. We observe, however, that some of the provisions are narrowly tailored to further the State's interest in maternal health, such as the requirement that the woman be told she is

pregnant and the probable gestational age of the fetus. Planned Parenthood tacitly concedes this point.

period was in effect, the District Court for the Western District of Tennessee made a finding of fact that over 3,000 abortions were performed during the year preceding the hearing in the case, *see Planned Parenthood of Memphis v. Alexander,* No. 78–2310 (W.D.Tenn. March 23, 1981), p. 7, and that, consequently, this requirement does not create an undue burden.[12]

In *Akron,* the United States Supreme Court struck down a twenty-four hour waiting period, reasoning that "careful consideration of the abortion decision by the woman 'is beyond the state's power to require.'" 462 U.S. at 450, 103 S.Ct. at 2503 (citation omitted). The Court characterized the twenty-four hour waiting period as "arbitrary and inflexible" and reasoned that the city had failed to show that the requirement increased the safety of abortion or otherwise furthered a legitimate state interest. *Id.* The Court concluded:

> The decision whether to proceed with an abortion is one as to which it is important to "affor[d] the physician adequate discretion in the exercise of his medical judgment." In accordance with the ethical standards of the profession, a physician will advise the patient to defer the abortion when he thinks this will be beneficial to her. But *if a woman, after appropriate counseling, is prepared to give her written informed consent and proceed with the abortion, a State may not demand that she delay the effectuation of that decision.*

*Id.* at 450–51, 103 S.Ct. at 2503 (emphasis added) (citation omitted) (footnote omitted). Although later the authors of the

*Casey* opinion determined that a 24–hour waiting period did not violate the "undue burden" standard, 505 U.S. at 887, 112 S.Ct. at 2826, the reasoning of the Supreme Court in *Akron* is equally applicable to the challenge made here under the Tennessee Constitution. As the trial court stated,

> a woman contemplating an abortion should be allowed "sufficient time for reflection" before she makes an informed decision. However, a "sufficient amount of time" varies with each individual woman, and the inflexibility of a two-day waiting period as it applies to every woman except in a medical emergency situation requires its invalidation. The majority of the expert testimony seemed to acquiesce in the fact that most women have seriously contemplated their decision before making their appointment ...; several of the witnesses testified that many of the patients at Planned Parenthood were referred by other private physicians, indicating that the woman already has at the very least a basic understanding of her situation and the decisions now before her. To *mandate* that she wait even longer insults the intelligence and decision-making capabilities of a woman....

Evidence in the record indicates that patient mortality rates for abortions increase as the length of pregnancy increases. Studies also suggest that a large majority of women who have endured waiting periods prior to obtaining an abortion have suffered increased stress, nausea and physical discomfort, but very few have re-

12. Although we did not grant permission to appeal the issue, defendants also argue that Planned Parenthood is collaterally estopped from challenging the two-day waiting period requirement because of *dicta contained in Planned Parenthood of Memphis v. Alexander* In holding that the waiting period was unconstitutional under the strict scrutiny standard, Judge Wellford commented that he was not persuaded that the waiting period constitutes an undue burden. Even assuming that the

parties to the *Alexander* case are the same parties in the present controversy, and assuming that the parties had a full and fair opportunity to present their positions in the earlier case, the two cases involve different issues. The issue before this Court is whether the waiting period furthers a compelling state interest under the Tennessee Constitution, and we are the final arbiters of such a question. Accordingly, in our view, the defendants' collateral estoppel argument is without merit.

ported any benefit from having to wait. Moreover, evidence in the record indicates that the waiting period increases a woman's financial and psychological burdens, since many women must travel long distances and be absent from work to obtain an abortion. Planned Parenthood presents a compelling argument that, because the waiting period requires a woman to make two trips to the physician, the waiting period is especially problematic for women who suffer from poverty or abusive relationships. The States reliance on a district court's finding of fact, that the waiting period failed to decrease abortions, is misplaced. The finding was made over twenty years ago without any apparent consideration of the actual number of abortions sought in each year. Further, the State has simply failed to carry its burden to show that the two-day waiting period requirement, mandating the longest waiting period in the country, is narrowly tailored to further its compelling interest in maternal health. The two-day waiting period therefore is unconstitutional.

We likewise conclude that the two-day waiting period has the effect of placing "a substantial obstacle in the path of a woman seeking an abortion," and therefore fails to pass muster under an undue burden analysis. *See Casey,* 505 U.S. at 878, 112 S.Ct. at 2821. While the statute refers to a "two-day waiting period," the waiting period is actually a three-day waiting period because the patient may not sign the consent form until the "third day following the day [the required] information was given." Tenn.Code Ann. § 39–15–202(d)(1). This extremely long waiting period, the longest in the nation, suggests that the waiting period requirement is not intended as an opportunity for reflection, but is actually intended as an obstacle to abortion.

#### c. *Medical Emergency Exceptions*

 Finally, it is clear that the medical emergency exceptions are not narrowly tailored to advance the State's interests in maternal health. As the Court of

Appeals noted, these medical emergency exceptions are too narrow to pass constitutional muster even under the less exacting undue burden standard. *Casey,* 505 U.S. at 880, 112 S.Ct. at 2822. The statutes contain two emergency medical exceptions, Tenn.Code Ann. § 39–15–202(d)(3) and –202(g). Subsection 202(d)(3) is a narrow provision addressing the waiting period and states that the two-day waiting period will not apply when the attending physician determines that a waiting period "would endanger the life of the pregnant woman." Subsection 202(g) provides an exception to the informed consent and physician-only requirements and the two-day waiting period requirement when "necessary to preserve the life of the pregnant woman." We initially agree with Planned Parenthood and the Court of Appeals that both exceptions should be read to only cover circumstances where a woman's pregnancy is endangering her life. We decline to read the word "life" to mean "life and health." If the legislature had intended these medical emergency exceptions to cover "life and health" it could have easily said so. *See* Tenn.Code Ann. § 39–15–201(c)(3) (medical emergency exception to prohibition against post-viability abortions if necessary to preserve the woman's "life or health"). It is well settled that when the words of a statute are plain, clear, and unambiguous, we merely look to the statute's plain language to interpret its meaning. *E.g., Schering–Plough v. State Bd. of Equal.,* 999 S.W.2d 773, 775–76 (Tenn.1999). In our view, the legislature intended the medical emergency exceptions at issue to protect only the life, as opposed to the health, of the woman.

As written, the medical emergency exceptions fail to pass constitutional muster. They impermissibly impinge upon a woman's fundamental procreational autonomy because they do not contain adequate provisions that will permit immediate abortions necessary to protect a woman's health. For this reason, they also fail to satisfy an undue burden analysis. *See*

*Stenberg v. Carhart,* 530 U.S. at ——, 120 S.Ct. at 2613.

### IV. CONCLUSION

In summary, we hold that a woman's right to terminate her pregnancy is a vital part of the right to privacy guaranteed by the Tennessee Constitution. That right is inherent in the concept of ordered liberty embodied in the Tennessee Constitution and is similar to other privacy interests that have previously been held to be fundamental. We therefore conclude that this specific privacy interest is fundamental. Therefore, the statutory provisions regulating abortion must be subjected to strict scrutiny analysis. After our review of the record and applicable authorities, we conclude that under the Tennessee Constitution, the statutes at issue, Tenn.Code Ann. § 39–15–201(c)(2) (the second trimester hospitalization requirement), § 39–15–202(b), (c) (the informed consent and physician-only counseling requirements), § –202(d)(1) (the mandatory waiting period requirement), and § –202(d)(3) and (g) (the medical emergency exceptions) are unconstitutional because the statutes are not narrowly tailored to further compelling state interests. Accordingly, we reverse the Court of Appeals' judgment that, facially, the hospitalization requirement, the physician-only counseling requirement, and the waiting period requirement are constitutionally valid. We agree with the Court of Appeals, however, that the medical emergency exceptions are unconstitutional. Consequently, the Court of Appeals' judgment is affirmed in part and reversed in part. This case is remanded to the trial court for entry of a permanent injunction stating:

> Defendants, in their official capacity, are hereby permanently restrained and enjoined from enforcing any provision of Tenn.Code Ann. § 39–15–201(c)(2),(d) and Tenn.Code Ann. §§39–15–202(b)(c),(d), and (g).

Costs of appeal will be taxed against the State for which execution may issue if necessary.

BARKER, J., filed a dissenting in part and concurring in part opinion.

WILLIAM M. BARKER, J., dissenting in part, concurring in part.

*A constitution is not to be made to mean one thing at one time, and another at some subsequent time, when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable. A principal share of the benefit expected from written constitutions would be lost, if the rules they established were so flexible as to bend to circumstances or be modified by public opinion.*

> *McCully v. State,* 102 Tenn. 509, 532–33, 53 S.W. 134, 139–40 (1899).

Undoubtedly, the issue of abortion is one of the most controversial and fiercely debated political issues of our time, and any resolution of this issue can only be achieved through deliberative, thoughtful, and public dialogue. Nevertheless, with its decision today, the Court has elevated one extreme of this debate to a constitutional level and has made any meaningful compromise on this issue all but impossible. The Court has done so simply by proclaiming that the right to obtain an abortion is "fundamental" under the Tennessee Constitution, and that as such, our Constitution effectively removes from the General Assembly any power to reach a reasonable compromise that considers all of the important interests involved.

In writing separately from my colleagues, I wish to emphasize that the function of this Court is not to read preferences or predilections into the law, nor is it to rewrite the law merely because we can. Rather, our task today, in the familiar words of Chief Justice John Marshall, is "to declare what the law is" with respect to the constitutionality of this state's regulations on the right to obtain abortion. This task, though simply stated, is an exceed-

ingly complex undertaking, and it involves an examination of the language of the constitution and of the historical construction given to that language. In addition, we should be guided by legal precedent, canons of constitutional construction, and concerns of public policy.

With its conclusion that abortion regulations must withstand strict scrutiny analysis to be constitutionally permissible, this Court has consciously decided to ignore two centuries of settled constitutional interpretation concerning the proper scope of our Constitution. Despite the settled meaning of Article I, section 8, the Court has taken it upon itself to suddenly change the import of this provision so as to reach its desired conclusion. In fact, the Court has even declared today that it "remains opposed" to any assertion that prior cases interpreting our constitution should control the outcome of this case.

This Court has a duty to the people of this state to articulate the basis for its decisions with a clear and precise rationale and to establish an adequate foundation for its decision in legal precedent. Regrettably, however, the Court has failed to provide a persuasive basis for its conclusion that the Tennessee Constitution gives greater protection for abortion rights than the federal Constitution. Although the majority purports to ground its decision in the language and structure of our Constitution, closer examination reveals that its constitutional leap is completely without foundation. While the law certainly must have room to grow and expand as the values and priorities of society change, this growth cannot come from the *judiciary* without being solidly grounded in experience, reason, and precedent. Absent any such foundation, the growth and expansion of the law must come from the representatives of the people assembled in the legislature.

The majority lauds at length the ability of our Constitution to guarantee greater protection for certain rights than is received from other sources. I certainly do not foreclose the possibility that the Tennessee Constitution can provide its citizens with greater liberty protections than the federal Constitution. On the contrary, in many cases, the judiciary has been able to advance the flag of liberty when the other branches of government have been unwilling or unable to do so, and judicial protection of liberty is the hallmark of our belief in the rule of law.

Any such protection of "liberty" by the judiciary, however, must be accompanied by something more than a mere declaration of the fact, and the courts cannot substitute their own view of the wisdom and desirability of legislation in order to protect what they alone perceive to be "fundamental rights." Absent a violation of a specific constitutional provision, it is within the realm and competence of the people's representatives in the General Assembly to make such value judgments. Otherwise, the cardinal doctrine of separation of powers, upon which the very theory of Tennessee government rests, *see* Tenn. Const. art 2, §§ 1, 2, is rendered utterly without meaning.

Accordingly, I dissent from the judgment of the Court holding that strict scrutiny analysis applies to review reasonable regulations on abortion. Instead, our Constitution should compel this Court to adopt the federal "undue burden" standard of review. While I agree with the majority that the undue burden standard is certainly a flexible standard, its flexibility allows some room to accommodate the myriad of compelling interests that are involved in this debate. The same cannot be said of strict scrutiny analysis. Nevertheless, because I find that the medical emergency exception cannot withstand even the "undue burden" analysis under the federal Constitution, I concur in that portion of the Court's judgment finding this provision unconstitutional. I would find that none of the other challenged provisions, though, places an undue burden on the right to obtain an abortion, and thus, each withstands constitutional challenge.

## I. PROPER STANDARD OF APPELLATE REVIEW

The majority opinion concludes that regulations infringing on the right to obtain an abortion are subject to strict scrutiny analysis because "this right [to obtain an abortion] is inherent in the concept of ordered liberty embodied in the Tennessee Constitution," and "[t]herefore, the statutory provisions regulating abortion must be subjected to strict scrutiny analysis." Although this *ipso facto* conclusion may apply in some cases, strict scrutiny is certainly not required by the federal Constitution with regard to the right to obtain an abortion. *See Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (recognizing that the right to obtain an abortion is a fundamental right, but rejecting application of strict scrutiny). Rather, the only legitimate rationale for holding that abortion regulations may be subject to strict scrutiny analysis in Tennessee is that the Tennessee Constitution provides greater protection for this right than the federal Constitution. If our Constitution does not so provide, then this Court is obliged to apply the "undue burden" standard of review, which was articulated by *Casey* and compelled by the Fourteenth Amendment.

Before this Court may properly conclude that the Tennessee Constitution affords its citizens a greater right to obtain an abortion than the federal Constitution—and therefore compels strict scrutiny analysis of our regulations in situations when the federal Constitution does not—it should carefully examine the precise constitutional sources of this right. Only when a right is "implicitly or explicitly protected by a constitutional provision" can it be deemed "fundamental" and subject to heightened scrutiny. *See State v. Tester*, 879 S.W.2d 823, 828 (Tenn.1994); *Doe v. Norris*, 751 S.W.2d 834, 841 (Tenn.1988). The majority opinion concludes that the right to obtain an abortion stems from certain fundamental procreational rights, which in turn

are derived from the general right of privacy. Even assuming the accuracy of these propositions, the Court should thoroughly examine the sources and parameters of the state right of privacy before concluding that it is more broad than the corresponding federal right.

Although a general right of privacy is mentioned nowhere in the text of our Constitution, this Court first recognized in *Davis v. Davis*, 842 S.W.2d 588 (Tenn. 1992), that a general right of privacy does in fact exist under the Tennessee Constitution. This general right is primarily grounded in the "Law of the Land" Clause of Article I, section 8 of our Constitution, which states: "That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty, or property, but by the judgment of his peers or by the law of the land." According to the *Davis* Court, a general right of privacy existed in Article I, section 8 because the right was "reflected in several sections of the Declaration of Rights." 842 S.W.2d at 600. These "several sections" included the freedom of worship, the freedoms of speech and press, the prohibition against unreasonable searches and seizures, and the regulation of quartering of troops. *Id.* Despite the majority's conclusion today that the state right of privacy is much more broad than the corresponding federal right, there are at least three specific reasons why such a conclusion is erroneous. I discuss each of these reasons below.

### A. Federal Case Law as the Source of Tennessee Privacy

The first reason that the state right of privacy cannot be more broad than the corresponding federal right is that this Court originally defined the scope and parameters of the state right of privacy exclusively in terms of federal constitutional law. Although the majority claims that *Davis* supports its position concerning the breadth of the state right of privacy, the

scope of the state right of privacy still cannot be said to exceed that of the federal right for one simple reason: every single state constitutional provision relied upon by the *Davis* Court to "discover" the state right of privacy also has corresponding federal support and protection. Because *Davis* interpreted and defined the state right of privacy solely in terms of the corresponding federal right, the majority's reliance on this case is misplaced and somewhat curious.

In an attempt to deny this critical fact, the majority emphatically states that "we explicitly relied on the Tennessee Constitution in Davis to extend protection [through the right of privacy] to the husband's right to procreational autonomy." While *Davis* was certainly a decision of state constitutional law as the majority maintains, the fact still remains that the rationale of *Davis* used to discover this new state constitutional right was *premised entirely upon federal case law.* There is certainly nothing in the constitutional thought of *Davis* that warrants placing the right of privacy on such a high pedestal, because as *Davis* implicitly acknowledges, the federal courts were the sole architects of our state house of privacy.

The majority counters that some of these state protections are more broad than their corresponding federal counterparts, and consequently, the state right of privacy must also be more broad. The majority even goes so far as *to count the words* of various state and federal provisions, apparently on the novel constitutional theory that more words equal greater breadth. If word counting is the new method by which to determine the proper scope of our constitutional provisions, I tremble at the future of constitutional interpretation in this state.

Perhaps this innovative school of thought needs further consideration before it is used as rationale to declare laws unconstitutional. After all, the anti-slavery clause of Article I, section 33 contains seven words less than the Thirteenth Amendment, and the double jeopardy provision of Article I, section 10 contains three words less than the similar clause in the Fifth Amendment. Even the language of Article I, section 27, upon which the majority fashions its "inherent" right of privacy, is shorter than its federal counterpart in the Third Amendment. Is this Court now to infer, based on this logic, that each of these state protections is theoretically less broad that their federal counterparts? I need hardly say that such a conclusion over stretches even the most elastic of imaginations.

I take no issue with the ability of this Court to find, in the proper case, that greater protections exist under our State Constitution. There must be, however, some legitimate reason why this conclusion follows in a particular case, such as key differences in the historical background of the constitutional provisions, differences in the respective language of the provisions, or even key differences in the historical application of the clauses in Tennessee. Unless some legitimate difference between respective state and federal clauses can be found, courts engaging in such interpretive exploits cease to exercise Judgment and undertake to exercise Will instead. *Cf. The Federalist No. 78* (Alexander Hamilton) ("The courts must declare the sense of the law; and if they should be disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure to that of the legislative body. The observation, if it prove any thing, would prove that there ought to be no judges distinct from that body."). The courts of this state simply do not exercise legitimate judicial power when their decisions are grounded in nothing more than mere pronouncements or declarations.

The only Tennessee case to actually hold that a state constitutional provision is more broad than its corresponding federal protection relied upon the actual language of the text. Our decision in *State v. Jacu-*

*min,* 778 S.W.2d 430 (Tenn.1989), provides an excellent example of when textual differences could support a finding that the Tennessee Constitution gives greater protection than a corresponding federal right. In *Jacumin,* this Court concluded that the language in Article I, section 7, which states that a warrant may not issue "without evidence of the fact committed," weighed against adopting the "totality of the circumstances" test for examining the sufficiency of an affidavit used to support a search warrant. Instead, this Court retained the *Aguilar–Spinelli* two-pronged test, which specifically requires specific examination of the credibility and reliability of the informant.

Other than *Jacumin,* however, I am unaware of any case in any area of law that actually holds that a state freedom is greater than the corresponding federal freedom. While this language appears in many of our cases, this Court has not seen fit to employ the possibility of greater protection in even one other case.[1] Accordingly, while the state protections may be greater *in theory,* they have certainly not received such attention *in practice.* As a practical matter, therefore, even if the state right of privacy is grounded in these other provisions of the Declaration of Rights, it still cannot be more broad than the corresponding federal right.

### B. Absence of a "Savings Clause" or "Natural Rights" Clause

The second reason that the state right of privacy cannot be more broad than the

federal right is because our Constitution is not structured in such a way as to permit this conclusion. I do not necessarily disagree that a right of privacy may exist in Tennessee, but the reasoning used by the *Davis* Court to discover the right of privacy, coupled with the structure of the Declaration of Rights itself, leads me to conclude that the scope of the right in Tennessee is, at most, co-extensive with the federal right—if for no other reason than the right of privacy enjoys significantly less constitutional foundation in this state.

In *Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Supreme Court of the United States first stated that the federal right of privacy was actually grounded in the Ninth Amendment and the Due Process Clause of the Fourteenth Amendment. Although the right of privacy was said to be a "penumbral" right that "emanated" from other constitutional amendments, the textual basis of the right of privacy was said to be the Ninth and Fourteenth Amendments. *See also Roe v. Wade,* 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (finding that the privacy right giving rise to a right to abortion is broad enough to fall within the Ninth Amendment or the Fourteenth Amendment). While constitutional scholars have debated whether Justice Douglas properly interpreted the Ninth Amendment in *Griswold* to include a general right of privacy,[2] such a right arguably falls within the plain language of that Amendment, which contemplates that oth-

---

1. As another possible example of greater state protection, the majority cites *State v. Lakin,* 588 S.W.2d 544 (Tenn.1979), in which, as the majority claims, this Court held that the language of Article I, section 7 gave greater protection in the context of the "open fields" doctrine. The actual holding of *Lakin,* however, was to affirm the Court of Criminal Appeals, which held the particular search unreasonable under *both* Article I, section 7 and the Fourth Amendment.

2. See most notably, Robert H. Bork, *The Tempting of America* (1990):

Justice Douglas bypassed that seemingly insuperable difficulty [of finding textual support for the right of privacy] by simply asserting that the various separate 'zones of privacy' created by each separate provision of the Bill of Rights somehow created a general but wholly undefined 'right of privacy' that is independent of and lies outside any right or 'zone of privacy' to be found in the Constitution. Douglas did not explain how ... the Court could ... invent a general right of privacy that the Framers had, inexplicably, left out.
*Id.* at 97–98.

er rights may exist although not specifically mentioned in the Bill of Rights.

In stark contrast to the provisions of the federal Constitution, however, the Tennessee Constitution does not contain a "savings" clause similar to that of the Ninth Amendment into which a court could legitimately read other unenumerated rights. In fact, unlike many of our sister states, our Constitution does not even contain a general "natural rights" clause purporting to protect "inalienable rights," which would at least lend a modicum of support to the majority's assertion concerning the presence and strength of our right of privacy.[3] Because our Constitution contains neither of these clauses, a careful and prudent examination of the Declaration of Rights counsels against holding that the right of privacy in this state is so much more broad than the corresponding federal right. Indeed, because the right of privacy cannot be textually grounded in the text of our Constitution outside of Article I, section 8, one may even rationally conclude—shockingly contrary to the position taken by the majority—that the *federal* right of privacy is actually the more broad of the two.

To offset this lack of structural support, the majority casts a wide net over our Declaration of Rights to fish out constitutional provisions which seemingly give rise to a broad right of privacy. The majority goes so far as to declare that the right of privacy, including the right of procreational autonomy, arises from the liberty provisions of Article I, sections 1 and 2. Citation to sections 1 and 2 of Article I for this proposition is nothing short of remarkable, and in its haste, the majority even declares that "[t]he provisions of the Tennessee Constitution imply protection of an individual's right to make inherently personal decisions, and to act on those decisions, without government interference." This unqualified statement is literally breathtaking, as its natural conclusion is that the government is without legitimate power to enact reasonable legislation having a direct effect on "inherently personal decisions."

Any reasonable and objective interpretation of these two sections simply cannot support the view that these two provisions reflect a "right to be left alone" by the government. Rather than providing a "right to be left alone," section 2 of Article I more properly contemplates that the people have *a duty to obey* the reasonable laws of government, irrespective of wheth-

---

**3.** Several other state constitutions contain broad "natural rights" clauses, even in addition to "savings clauses" similar to that of the Ninth Amendment. *See, e.g.,* Fla. Const. art. 1, § 2 ("All natural persons, female and male alike, are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property...."); Ill. Const. art. 1, § 1 ("All men are by nature free and independent and have certain inherent and inalienable rights among which are life, liberty and the pursuit of happiness. To secure these rights and the protection of property, governments are instituted among men, deriving their just powers from the consent of the governed."); Ind. Const. art. 1, § 1 ("That all people are created equal; that they are endowed by their CREATOR with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness...."); Iowa Const. art. 1, § 1 ("All men are, by nature, free and equal, and have certain inalienable rights-among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety and happiness."); Kan. Const. Bill of Rights, § 1 ("All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness."); Me. Const. art. 1, § 1 ("All people are born equally free and independent, and have certain natural, inherent and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness."); N.H. Const. Art. 1, § 1 ("All men have certain natural, essential, and inherent rights-among which are, the enjoying and defending life and liberty; acquiring, possessing, and protecting, property; and, in a word, of seeking and obtaining happiness. Equality of rights under the law shall not be denied or abridged by this state on account of race, creed, color, sex or national origin.").

er those laws directly affect the people.[4] The majority should give more careful attention to the actual language of this clause, which condemns only the exercise of *arbitrary* power. Although the majority lauds this "right to revolution," section 2 provides no such "right to be left alone" from reasonable legislation that has been duly enacted according to constitutional procedures.

Sections 1 and 2 of Article I simply do not reflect a right of privacy in the sense that the government has no power to enact laws directly affecting its citizens, and these clauses are improperly construed when used to support striking down reasonable abortion regulations under the guise of protecting a right of privacy. When understood in their proper historical context, these provisions are really a reflection of the fundamental principal that the people are the ultimate sovereign and that all governmental power is derived from them. Even *Davis* did not take the questionable constitutional leap taken by the majority today, as that Court cited these two sections of Article I only to show that individual liberty is deeply embedded in our Constitution—not to show that these clauses reflected a general right of privacy. *See* 842 S.W.2d at 599–600. Regrettably, this type of analysis, with its complete disregard for the language and purpose of the clause, exemplifies how willing the majority is to construe constitutional precedent to reach its desired result in this case.

### C. Scope of Article I, Section 8

The third reason that the majority errs in concluding that the State right of privacy is more broad than the corresponding federal right is that the only proper textual basis of the right of privacy, the "Law of the Land" Clause of Article I, section 8, is not more broad than its federal counterparts, the Due Process Clauses of the

Fifth and Fourteenth Amendments. When discussing the sources of the state right of privacy, the majority conspicuously omits any reference to *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn.1993), which holds that Article I, section 8 is the only constitutional provision in which the right of privacy may be textually grounded. *Id.* at 579. Certainly, no legal precedent or canon of constitutional construction allows this Court to discover previously unprotected rights without at least some textual support in our Constitution, and this Court in *Hawk* repudiated such an approach by analyzing the right of privacy with exclusive reference to Article I, section 8.

In the present case, however, the majority apparently ignores the need for textual support and attempts to use all of the provisions cited by *Davis* to bootstrap a right of privacy—and by extension, a right to obtain an abortion—into the Constitution. Even as the majority attempts to rewrite the budding Tennessee law of privacy, though, industrious students of the law should read carefully once again the cases from this Court deciphering the scope of the state right of privacy. While the constitutional provisions cited by the *Davis* Court as "reflecting" a right of privacy unquestionably have various aspects of privacy at their core, none of these provisions can be said to actually serve as the textual basis of "procreational rights" on their own. The protection against unreasonable searches and seizures, for example, says nothing about the right not to bear children, and procreational rights cannot be read into the language regulating quartering of troops. Only the "Law of the Land" Clause of Article I, section 8 is sufficiently vague and ambiguous to provide textual support for the right to obtain an abortion.

The essential question to be answered in this case, therefore, is whether the "Law of the Land" Clause is more broad than the Due Process Clauses of the Fifth and

---

4. Article 1, section 2 reads: "That government being instituted for the common benefit, the doctrine of non-resistance against arbi-

trary power and oppression is absurd, slavish, and destructive of the good and happiness of mankind."

Fourteenth Amendments, which serve as the basis for protecting abortion rights under the federal Constitution. *See Casey*, 505 U.S. at 846, 112 S.Ct. 2791. Only if the liberty protections of the Tennessee "Law of the Land" Clause are more broad than those protections guaranteed by the federal due process clauses can this Court properly hold abortion regulations to the rigors of strict scrutiny analysis.

Accordingly, if Article I, section 8 does provide a greater sanctuary for abortion rights than the federal due process clauses—as the majority holds today—one would expect to find key differences in the historical background of the clauses, differences in the respective language of the clauses, or key differences in the historical application of the "Law of the Land" Clause in Tennessee. Nevertheless, while these factors are completely ignored by the majority opinion, my own analysis leads me to conclude that the two protections are, at most, co-extensive, and when a statute is permissible under one constitutional provision, then it is permissible under the other as well.

*Comparison of the Historical Background of the "Law of the Land" Clause and the Federal Due Process Clauses*

Nothing in the historical background of the "Law of the Land" Clause or of the federal due process clauses suggests that the Tennessee Constitution gives greater protection to liberty interests than does the federal Constitution. In fact, my research on this issue reveals that the history of each clause can be traced precisely to the same source: the "per legem terrae," or "Law of the Land," clause in Chapter 29 of Magna Carta, which states that "[N]o free man shall be taken or imprisoned or dispossessed, or outlawed, or banished, or in any way destroyed, nor will we go upon him, nor send upon him, except by the legal judgment of his peers or by the law of the land." [5] Because each clause stems historically from the same original source, the majority cannot rely upon historical differences to conclude that the general protection of liberty in Tennessee is greater than that provided by the federal Constitution.

The "Law of the Land" Clause enjoys a long history in the constitutional jurisprudence of this State, and because its proper interpretation is essential to the resolution of this case, it is important to carefully examine from where the clause was derived. In the years following American Independence, the lands that were later organized into the State of Tennessee were principally claimed by the State of North Carolina, and were governed by the Constitution and laws of that state. Apart from establishing a theory and form of government, the North Carolina Constitution of 1776 also contained a "Declaration of Rights," which placed certain fundamental rights "beyond the reach of any act of Assembly ." *See Marshall v. Lovelass*, 1 N.C. (Tay.) 412 (1801) (Johnston, J.). Section 10 of the North Carolina Declaration of Rights of 1776 read:

> [N]o freeman ought to be taken, imprisoned, or disseized of his freehold, liberties or privileges, or outlawed or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the law of the land.

In June of 1784, North Carolina joined with other states in ceding its lands west of the Allegheny Mountains to the national government organized under the Articles of Confederation. Although North Car-

---

5. Although the "per legem terrae" clause appeared in Chapter 39 of the original version of Magna Carta signed by King John at Runnymede in 1215, the effect of this document was annulled almost immediately by Pope Innocent III, presumably at the request of King John. Henry III reconfirmed the provisions of Magna Carta several times, most no-tably in 1225, and Edward I re-issued a version of Magna Carta in 1297 as a part of his Confirmation of the Charters. The "per legem terrae" clause appears in Chapter 29 of the 1297 version of Magna Carta, which is the document usually cited by constitutional scholars as providing the basis for substantive limitation on the power of government.

olina later repealed its cession law and reclaimed the ceded lands, East Tennessee took this opportunity to briefly organize itself into the State of Franklin—named after Benjamin Franklin—in anticipation of joining the federal union as a new state. In section 12 of the "Declaration of Rights Made by the Representatives of the Freemen of the State of Franklin"—a document taken substantially from the North Carolina Declaration of Rights,[6]—the following clause appeared:

> That no freeman ought to be taken, imprisoned or desseized of his freehold, liberties or privileges, or outlawed or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the laws of the land.

This original "Law of the Land" Clause, along with the entire Declaration of Rights, was explicitly made a part of the Franklin Constitution by section 44 of that document. *See* Const. of the State of Franklin § 44 ("That the Declaration of Rights is hereby declared to be part of the Constitution of this State, and ought never to be violated on any pretense whatsoever.").

On December 22, 1789, North Carolina again ceded its western lands to the national government, *see* 1789 N.C. Pub. Acts 31, ch. 3, and by a provision of the act of separation, the laws of North Carolina became the laws of Tennessee, until repealed by the Legislative authority of the ceded territory. Congress accepted the cession on April 2, 1790, Act of April 2, 1790, ch. 6, 1 Stat. 106, and organized the territory into the Southwestern Territory, Act of May 20th, 1790, 1 Stat. 123. In this Act, Congress declared that "the government of the said territory . . . shall be similar to that which is now exercised in the territory north-west of the Ohio. . . ." In the second article of the Ordinance of 1787 for the Government of the Northwest Territory, a clause similar to the earlier North Carolina and Franklin "Law of the Land" clauses again appeared, which stated that "no man shall be deprived of his liberty or property but by the Judgment of his Peers, or the law of the land." 1 Stat. 51, note.

This early history of Article I, section 8 is especially significant, because the respective provisions of state and federal law giving rise to the "Law of the Land" Clause in our 1796 Constitution were each directly descended from Chapter 29 of Magna Carta. For example, both the United States Supreme Court and the Supreme Court of North Carolina have recognized that the respective federal and state "Law of the Land" clauses were derived from the nearly identical provision of Magna Carta. *See Murray v. Hoboken Land & Improvement Co.,* 59 U.S. 272, 276, 18 How. 272, 15 L.Ed. 372 (1855); *State v. ___,* 2 N.C. (1 Hayw.) 28 (N.C.Sup. Ct.L. & Eq. 1794) (stating that "if we attend to the ["Law of the Land" Clause of the North Carolina Declaration of Rights], we shall find it was copied almost verbatim from the 29th chap. of Magna Charta"); *see also Bank of Columbia v. Okely,* 17 U.S. (4 Wheat.) 235, 243, 4 L.Ed. 559 (1819) (stating that "[t]he 21st article of the declaration of rights of the state of Maryland"—which is virtually identical to Article I, section 8 of the Tennessee Constitution—"is in the words of Magna Charta"). This ancestry has also been long recognized by the Tennessee Supreme

---

6. We know that Franklin's Declaration of Rights was substantially taken from that of North Carolina by a letter written by the Franklin Assembly in reply to a letter from then North Carolina Governor Alexander Martin written on February 27, 1785. In order to make clear that Franklin was not organized out of any dissatisfaction with the laws of North Carolina, the Assembly stated that "the first law we enacted was to secure and confirm all the rights granted under the laws of North Carolina in the same manner as if we has not declared ourselves an independent State; [we] have patronized her Constitution and laws and hope for her assistance and influence in Congress to precipitate our reception into the Federal Union." *See Antebellum History of Tennessee* 53–54 (Eric R. Lacy, ed.1980)

Court, which has frequently stated that our own "Law of the Land" Clause of Article I, section 8 is a direct descendant of the "per legem terrae" clause of Magna Carta's twenty-ninth chapter. *See, e.g., State ex rel. Anglin v. Mitchell,* 596 S.W.2d 779, 786 (Tenn.1980) (stating that Article I, § 8 comes from Magna Carta); *McGinnis v. State,* 28 Tenn. (9 Hum.) 43, 47 (1848) (comparing Article I, section 8 to the similar provision in Magna Carta).

In a similar manner, the "per legem terrae" clause of Magna Carta is also the ancient ancestor of the modern Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States. The first prominent use of the term "due process of law" was in a 1354 English statute, which provided that "[n]o man of what estate or condition that he be, shall be put out of land or tenement, nor taken nor imprisoned, nor disinherited, nor put to death, without being brought in answer by due process of the law,"[7] and Sir Edward Coke confirmed that the use of the term "due process" in this 1354 statute was closely tied to the phrase "Law of the Land" in Magna Carta, *see* 2 Institutes 50 (5th ed.1797). Moreover, the Supreme Court of the United States has repeatedly stated, and constitutional scholars have agreed, that the Fifth Amendment's Due Process Clause is descended from the "per legem terrae" clause of Magna Carta. *See, e.g., Planned Parenthood v. Casey,* 505 U.S. 833, 847, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (stating that "the guaranties of due process [have] their roots in Magna Carta's 'per legem terrae' ") (citing *Hurtado v. California,* 110 U.S. 516, 532, 4 S.Ct. 111, 28 L.Ed. 232 (1884)); *O'Bannon v. Town Court Nursing Ctr.,* 447 U.S. 773, 789 n. 2, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (Blackman, J., concurring in judgment) ("It is well recog-

nized that the Due Process Clauses of the United States Constitution grew out of the 'Law of the Land' provision of Magna Carta and its later manifestations in English statutory law."); *see also,* Frank R. Strong, *Substantive Due Process of Law: A Dichotomy of Sense and Nonsense* 3–25 (1986) (tracing the antecedents of substantive due process to Magna Carta).

Given that Article I, section 8 and the federal due process clauses both owe their ancestry to Magna Carta's twenty-ninth chapter, the historical background of the clauses certainly provides no support for the proposition that the "Law of the Land" Clause is more broad than the corresponding federal due process protections. At most, any analysis of the historical background of the clauses shows that the protections intended by each clause are substantially identical, and that both of the protections are the same as those contemplated by the "per legem terrae" clause of Magna Carta. Accordingly, the majority must seek support from elsewhere for its conclusion that the state constitution provides greater sanctuary for the abortion rights than the federal Constitution.

### Textual Comparison of the Respective Clauses

Although this Court has often noted that differences in the language of constitutional provisions can sometimes imply that a right is subject to greater protection under our state Constitution,[8] the textual differences in this case can be accorded very little weight in terms of constitutional significance. With respect to the language of the federal Constitution, there can be little doubt that the phrase "due process of law" was meant to provide for the same substantive guarantees as the phrase "law of

---

7. *See* 28 Edw. III, ch. 3 (1354) (Eng.), *cited in Constitution of the United States of America, Analysis and Interpretation* 1281, Senate Doc. No. 99–16, 99th Congress 1st Session (1987).

8. I refer once again to our decision in *State v. Jacumin,* 778 S.W.2d 430 (Tenn.1989), which provides a good example of when textual differences can support a finding that the Tennessee Constitution gives greater protection than the corresponding federal right.

the land." [9] In fact, the United States Supreme Court, in its first significant interpretation of the Fifth Amendment Due Process Clause, confirmed this fact by stating that "[t]he words, 'due process of law,' were undoubtedly intended to convey the same meaning as the words, 'by the law of the land,' in Magna Carta." *Murray v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 276, 18 How. 272, 15 L.Ed. 372 (1855).

Although it should be of little surprise given the common history of the phrases, the Tennessee Supreme Court has also consistently held or stated under all three Constitutional periods since 1796 that the phrase "law of the land" carries with it the same import and meaning as the phrase "due process of law." [10] Indeed, several of these cases were decided under previous constitutional periods, and in the interest of continuity in the law, this Court has long accorded these older cases much weight when construing substantially identical provisions in the 1870 Constitution. *Cf. Cumberland Capital Corp. v. Patty*, 556 S.W.2d 516, 526 (Tenn.1977). Moreover, Tennessee is not alone in interpret-

**9.** *See* James W. Ely, Jr., *The Oxymoron Reconsidered, Myth and Reality in the Origins of Substantive Due Process*, 16 Const. Comm. 315 (1999). In noting the difference in the wording between Magna Carta and the Fifth Amendment, Professor Ely comments:

> James Madison, of course, selected the phrase "due process of law" in drafting the Fifth Amendment. The reasons for Madison's change in wording are unclear, but one scholar has suggested that he chose due process language to secure "more encompassing protection of personal liberty." The history of framing and debating the Bill of Rights is remarkably skimpy, and a good deal must rest upon historical conjecture. Since the view that "due process of law" and "law of the land" had the same meaning was broadly shared, it seems unlikely that Madison envisioned any departure from the general understanding of this concept. Indeed, in drafting the Bill of Rights Madison harbored no plan to fashion new rights or depart from settled norms. He intended to formulate a document which reflected a consensus about widely held values. As Madison explained to Thomas Jefferson, "Every thing of a controvertible nature that might endanger the concurrence of two-thirds of each House and three-fourths of the States was studiously avoided." It thus seems appropriate to conclude that Madison used "due process of law" in light of its historical association with the substantive dimensions of the "law of the land" clause.

> *Id.* at 325 (footnotes omitted).

**10.** *See, e.g., State v. Hale*, 840 S.W.2d 307, 312 (Tenn.1992) ("The phrase, 'the law of the land,' used in this section of our State Constitution, and the phrase, 'due process of law,' used in the Fifth Amendment and in the first section of the Fourteenth Amendment to the Constitution of the United States, are synonymous phrases meaning one and the same thing."); *Scopes v. State*, 154 Tenn. 105, 111, 289 S.W. 363, 364 (1927) ("[T]he law of the land clause of the state Constitution, and the due process of law clause of the federal Constitution, which are practically equivalent in meaning."); *State ex rel. Condon v. Maloney*, 108 Tenn. 82, 88, 65 S.W. 871, 872 (1901) ("[I]t is said that the phrase 'by the law of the land,' as used in section 8, art. 1, of the state constitution, is the exact equivalent of the term 'due process of law,' as used in the federal constitution."); *Harbison v. Knoxville Iron Co.*, 103 Tenn. 421, 431, 53 S.W. 955, 957 (1899) ("What, then, is 'due process of law,' or 'the law of the land'? The two phrases have exactly the same import. . . ."); *Knoxville & O.R. Co. v. Harris*, 99 Tenn. 684, 704, 43 S.W. 115, 120 (1897) (stating that " 'due process of law' and the 'law of the land' are synonymous phrases"); *Knox v. State*, 68 Tenn. (9 Baxt.) 202, 207 (1877) ("The law of the land, in the sense of this clause of the constitution, has been held to be equivalent in meaning to 'due process of law.' "); *State v. Staten*, 46 Tenn. (6 Cold.) 233, 244 (1869) ("The phrase, 'the law of the land' is another expression for the 'due process of law;' and is of equivalent import ."); *Owens v. Rain's Lessee*, 6 Tenn. (5 Hayw.) 106, 107 (1818) (" 'No freeman shall be disseised of his freehold liberties or privileges, or outlawed or exiled, or in any manner deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land;' that is, in due course of law, and by judicial proceedings regularly commenced and prosecuted to judgment."); *Kittrell v. Kittrell*, 56 Tenn.App. 584, 588, 409 S.W.2d 179, 181 (1966) ("The phrase 'law of the land' as used in this Section and the phrase 'due process of law' as used in the first section of the Fourteenth Amendment to the Federal Constitution are synonymous and a statute which violates one is violative of the other.").

ing the phrase "law of the land" to mean "due process of law." North Carolina's Constitution receives a similar interpretation from its courts, as do the Constitutions of Maryland and Pennsylvania, from which it is generally supposed that the North Carolina Constitution was substantially derived. *See* Lewis L. Laska, *The Tennessee Constitution* 5 (1990).[11]

Consequently, because both federal and Tennessee courts have interpreted the phrases "due process of law" and "law of the land" to carry the same essential meaning, the majority's premise concerning the breadth of Tennessee's "Law of the Land" Clause cannot be sustained on the basis of any textual differences in the two clauses. As the common history of the clauses would naturally lead one to conclude, the textual differences between the two phrases are of no significance in terms of substantive constitutional law, and despite their minor textual differences, the respective clauses provide co-extensive protections of liberty. Accordingly, the majority cannot rely upon any perceived textual differences between Article I, section 8 and the Fourteenth Amendment to

support its position concerning the breadth of the Tennessee "Law of the Land" Clause.

### *Historical Application of the "Law of the Land" Clause in Tennessee*

Although the majority apparently treats it as an issue of first impression in this State, the legitimate scope of Article I, section 8 has long been settled, and a careful and thorough review of our constitutional jurisprudence reveals nothing in the historical application of Article I, section 8 that warrants the conclusion that Tennessee's protection of liberty is far more extensive than that provided by the federal due process clauses. In fact, rather than being construed more broadly than the corresponding federal protections, Article I, section 8 has been universally interpreted as providing *co-extensive* protection with that of the federal constitution. In fact, virtually every Tennessee case examining the two clauses has concluded that the import and meaning of each clause are either exact, identical, or synonymous in

11. *See Owens v. State,* 352 Md. 663, 724 A.2d 43, 46 n. 3 (1999) (recognizing that the Maryland "Law of the Land" Clause is the equivalent to the federal due process clauses, and stating that "United States Supreme Court cases on the subject therefore are 'practically direct authorit[y]' for the meaning of the Maryland provision") (citing *Northampton Corp. v. Washington Suburban Sanitary Comm'n,* 278 Md. 677, 686, 366 A.2d 377, 382 (1976)); *Meads v. North Carolina Dep't of Agric., Food & Drug Protection Div.,* 349 N.C. 656, 509 S.E.2d 165, 175 (1998) (stating that the "Law of the Land" Clause contained in Article I, section 19 of the North Carolina constitution is "synonymous" with the Due Process Clause of the Fourteenth Amendment); *Commonwealth v. Martin,* 727 A.2d 1136, 1141 (Pa.Super.Ct.1999) ("The terms 'due process of law' and "law of the land" [in article I, § 9] are legal equivalents."); *see also Gannon v. State,* 704 A.2d 272, 278 (Del.1998) ("It is now well established that the phrase 'nor shall be deprived of life, liberty, or property, unless by . . . the law of the land' in Article I, Section 7 of the Delaware Constitution has substantially the same meaning as 'nor be deprived of life, liberty, or property, without due process of

law' in the Fifth Amendment of the United States Constitution."); *Parker v. Gorczyk,* 744 A.2d 410, 416 (Vt.1999) (" '[A]s final interpreter of the Vermont Constitution, this Court has final say on what process is due in any given situation.' Nevertheless, the term 'laws of the land' in Article 10 is synonymous with the term 'due process of law' contained in the Fourteenth Amendment of the United States Constitution, and, as such, our own due-process jurisprudence has relied heavily on that of the United States Supreme Court even when our decisions were ultimately based on the Vermont Constitution.") (citations omitted).

Interestingly, although North Carolina "reserves the right" to expand the meaning of the state provision beyond the protections guaranteed in the federal Constitution, it has not done so with regard to privacy or "procreational rights." Moreover, my research into Maryland law has uncovered no case holding that a separate right of privacy even exists in Maryland, or that the procreational rights receive greater sanctuary under the Maryland Declaration of Rights than the federal Constitution.

effect and result,[12] and many of these cases have held that where a statute is constitu-

12. *See, e.g., State v. Trusty*, 919 S.W.2d 305, 309 (Tenn.1996), *overruled on other grounds by, State v. Burns*, 6 S.W.3d 453 (Tenn.1999) ("These notions of due process embraced by the United States Constitution are incorporated into Tennessee's 'Law of the Land Clause.' It guarantees that 'no man shall be ... deprived of his life, liberty, or property, but by ... the law of the land.' Tenn. Const. art. I, § 8. The two provisions are synonymous."); *Newton v. Cox*, 878 S.W.2d 105, ·110 (Tenn. 1994) ("This Court has previously held that the 'law of the land' provision of Article I, § 8 of the Tennessee Constitution is synonymous with the due process clause of the Fourteenth Amendment to the United States Constitution."); *State v. Hale*, 840 S.W.2d 307, 312 (Tenn.1992) ("The phrase, 'the law of the land,' used in this section of our State Constitution, and the phrase, 'due process of law,' used in the Fifth Amendment and in the first section of the Fourteenth Amendment to the Constitution of the United States, are synonymous phrases meaning one and the same thing."); *State ex rel. Anglin v. Mitchell*, 596 S.W.2d 779, 786 (Tenn.1980) ("Our federal constitution, through the Fourteenth Amendment, coins the phrase 'due process of law.' Our state constitution, through Article I, Section 8, expresses the same idea when it prohibits imprisonment and deprivation of life or liberty, but by 'the law of the land.' The origin of this phrase in the Tennessee Constitution is the Magna Carta. The 'law of the land' proviso of our constitution is synonymous with the 'due process of law' provisions of the federal constitution."); *Arutanoff v. Metropolitan Gov't of Nashville and Davidson County*, 223 Tenn. 535, 541, 448 S.W.2d 408, 411 (1969) ("Since the police power of this state is at least co-extensive with that of any other state of the union, being limited here by Article 1, Section 8, of the Constitution of Tennessee, which has been said to be equivalent in effect to the Due Process Clause of the Fourteenth Amendment...."); *Daugherty v. State*, 216 Tenn. 666, 675, 393 S.W.2d 739, 743 (1965) ("Defendant first cites Article 1, Section 8 of the Tennessee Constitution which is the 'law of the land' section. This is, of course, synonymous with the 'due process of law' used in the Fifth Amendment and in the First Section of the Fourteenth Amendment to the Constitution of the United States ."); *Mascari v. International Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of America (AFL) Local Union No. 667*, 187 Tenn. 345, 350, 215 S.W.2d 779, 781 (1948) ("[T]he real question is whether the Act violates the due process of law clause contained in the Fourteenth Amendment to the Constitution of the United States and in Article 1, section 8, of the Constitution of Tennessee. These provisions are substantially the same in effect and result."); *Scopes*, 154 Tenn. at 111, 289 S.W. at 364 ("It is contended that the statute violates section 8 of article 1 of the Tennessee Constitution, and section 1 of the Fourteenth Amendment of the Constitution of the United States—the law of the land clause of the state Constitution, and the due process of law clause of the federal Constitution, which are practically equivalent in meaning."); *Motlow v. State*, 125 Tenn. 547, 560, 145 S.W. 177, 180 (1912) ("The same rules must apply in disposing of a question arising under article 1, § 8, of our Constitution of 1870, embracing the 'law of the land' clause, because its provisions are in@ this regard, ... substantially the same as those contained in the second clause of the first section of the fourteenth amendment to the federal Constitution."); *State ex rel. Condon v. Maloney*, 108 Tenn. 82, 88, 65 S.W. 871, 872 (1901) ("[I]t is said that the phrase 'by the law of the land,' as used in section 8, art. 1, of the state constitution, is the exact equivalent of the term 'due process of law,' as used in the federal constitution."); *Knoxville & O.R. Co.*, 99 Tenn. at 704, 43 S.W. at 120 ("This double assailment may be treated as one objection, since 'due process of law' and the 'law of the land' are synonymous phrases, and that which is violative of the one is violative of the other also, and vice versa."); *Ferguson v. The Miners and Manufacturers' Bank*, 35 Tenn. (3 Sneed) 609, 616 (1856) (comparing the Fifth Amendment Due Process Clause to Article I, § 8); *Fields v. State*, 8 Tenn. (Mart. & Yer.) 168, 172–73 (1827) (comparing the Fifth Amendment and Article I, § 8 and stating, "Has the Constitution of the United States, or of this State, abridged the powers of the County Court in this respect? As the provisions in the two instruments referred to are the same in substance, I will only examine the Constitution of the State of Tennessee...."); *Nichols v. Tullahoma Open Door, Inc.*, 640 S.W.2d 13, 16 (Tenn. Ct.App.1982) ("The principles of due process under Article 1, Section 8 of the Tennessee Constitution are identical to those under the United States Constitution. Any prerequisites necessary to prove a due process violation under the United States Constitution would, therefore, be applicable to proving a violation of Article 1, Section 8 of the Tennessee Constitution."); *Breault v. Friedli*, 610 S.W.2d 134, 138 (Tenn.Ct.App.1980) ("In a similar manner, Article 1, section 8 has been held to be synonymous with the fifth and fourteenth amendments of the United States Constitution."); *Kittrell*, 56 Tenn.App. at 588, 409

tional under one provision, then it is entitled to be sustained under the other provision as well. *See Harbison v. Knoxville Iron Co.*, 103 Tenn. 421, 431, 53 S.W. 955, 957 (1899). Even in those cases in which the Tennessee Supreme Court has implied that a greater liberty protection may emanate from Article I, section 8, no such holding has ever been sustained on any set of facts.[13]

The majority apparently reads these cases differently than I, as the majority repeats several times that these older cases stand only for the proposition that the two clauses are *"practically* synonymous." As such, the majority concludes, we are free to depart from the history, language, and application of the "Law of the Land" Clause to reach the judicially desired result in this case. Respectfully, though, the language from this Court's own cases is far more compelling than the majority would indicate. Far from being merely *"practically* synonymous," the courts of this state have described these two phrases using the following language: *"are* synonymous," *see, e.g., Trusty,* 919 S.W.2d at 309; *"are* synonymous phrases meaning one and the same thing," *see, e.g., Hale,* 840 S.W.2d at 312; *"are equivalent* in effect," *see, e.g., Arutanoff,* 223 Tenn. at 541, 448 S.W.2d at 411; *"are identical,"* *see, e.g., Nichols,* 640 S.W.2d at 16; *"is* the exact equivalent," *see, e.g., Maloney,* 108 Tenn. at 88, 65 S.W. at 872; and *"are* synonymous and a statute which violates one is violative of the other," *Kittrell,* 409 S.W.2d at 181.

Although the majority certainly can find some language to support its "practically synonymous" theory, these cases are overwhelmed by authority to the contrary. The Court should be prepared to explicitly acknowledge that its decision today effectively overrules two centuries of settled constitutional construction, and it must state the reasons why such overruling is required, other than it has the inherent power to do so. Instead, with its decision today, the Court has tried, and failed, to distinguish all of these older cases on the basis of language alone. The people of this state deserve to know why the meaning of their constitution has suddenly changed overnight and what changed circumstances have required such a radical reversal.

The majority may have an even greater hurdle to overcome, however, than the lack of legal precedent or historical application upon which to ground its decision. My research of the relevant constitutional authority on this issue casts substantial doubt as to whether this Court even has the authority to find that state liberty protections are greater than the corresponding federal protections. Prior to 1870, several Tennessee cases asserted that the protections of Article I, section 8 were synonymous with federal due process protections. For example, in *Fields v. State,* 8 Tenn. (Mart. & Yer.) 168, 169 (1827), this Court examined whether a county court could remove a constable from public office for extortion. In answering the question in the affirmative under Tennessee law, this Court noted

S.W.2d at 181 ("The phrase 'law of the land' as used in this Section and the phrase 'due process of law' as used in the first section of the Fourteenth Amendment to the Federal Constitution are synonymous and a statute which violates one is violative of the other."); *Roberts v. Brown,* 43 Tenn.App. 567, 590–91, 310 S.W.2d 197, 208 (1957) ("Article I, Section 8 of the Constitution of Tennessee uses the phrase, 'the law of the land' whereas the phrase, 'due process of law' is used in the Fourteenth Amendment to the Constitution of the United States. These phrases have been held to be synonymous, meaning one and the

same thing, and that any statute which is violative of the one is violative of the other.").

13. *See, e.g., Burford v. State,* 845 S.W.2d 204, 207 (Tenn.1992) (finding no state or federal due process right "to collaterally attack constitutional violations occurring during the conviction process"); *Doe v. Norris,* 751 S.W.2d 834, 838 (Tenn.1988) (finding that both the state and federal Constitutions were consistent in their prohibition on commingling status offenders with delinquent children as punishment without prior adjudication of guilt).

that the federal due process protections and those contained in Article I, section 8 were "the same in substance." This Court reaffirmed this principle again in *Ferguson v. Miners & Manufacturers' Bank,* 35 Tenn. (3 Sneed) 609, 616 (1856), when it stated that the Fifth Amendment and Article I, section 8 provided the same due process protections, and our case law is also replete with statements from this Court saying that the phrase "Law of the Land" is synonymous with "due process of law." *See, e.g., State v. Staten,* 46 Tenn. (6 Cold.) 233, 244 (1869) ("The phrase, 'the law of the land' is another expression for the 'due process of law;' and is of equivalent import."); *Owens v. Rain's Lessee,* 6 Tenn. (5 Hayw.) 106 (1818) (stating that "law of the land" carries same meaning as "due course of law").

In point of fact, the 1870 Constitution was not a "new" constitution, but was largely a re-enactment of the older 1834 Constitution. *See Gold v. Fite,* 61 Tenn. (2 Baxt.) 237, 243 (1872) (stating that "[t]he Constitution of 1870 was not a new Constitution, but in all its main features was a re-enactment of the Constitution of 1834"). As such, "the judicial construction which had theretofore been placed upon it, forms a part of the enactment," and the construction is presumed to be as much a part of the re-enactment as if it were written into the plain language of the Constitution itself. *Cf. Smith v. North Memphis Sav. Bank,* 115 Tenn. 12, 30, 89 S.W. 392, 396 (1905); *see also Jenkins v. Ewin,* 55 Tenn. (8 Heisk.) 456, 475–76 (1872); *State v. Schlier,* 50 Tenn. (3 Heisk.) 281, 283 (1871). Indeed, this presumption may be accorded even greater weight given the fact that the 1870 Constitutional Convention re-enacted

Article I, section 8 unanimously, without substantive amendment, and without floor discussion.[14]

Accordingly, the modern version of the "Law of the Land" Clause itself incorporates the prior decisions of this Court concluding that its protections are co-extensive with that of federal due process. As such, this Court cannot now choose to "reinterpret" this provision so as to reach a more personally desirable result in this particular case. Even if this result does not necessarily follow, legitimate and fundamental questions are raised as to the authority of this Court to formulate new standards of review that are without historical or legal foundation and otherwise contrary to accepted canons of constitutional construction.

## II. EFFECT OF HOLDING THAT STRICT SCRUTINY OF ABORTION REGULATIONS IS CONSTITUTIONALLY COMPELLED

Plainly stated, the effect of the Court's holding today is to remove from the people all power, except by constitutional amendment, to enact reasonable regulations of abortion. Rather than leaving policy decisions regarding reasonable abortion regulation to the General Assembly, this Court has converted itself into a roving constitutional convention, which sees itself free to strike down the duly enacted laws of the legislature for no other reason than it feels they are burdensome and unwise. In so doing, the Court has been unable to convincingly point to any textual or historical basis for its decision, and its holding that our Constitution provides greater protection for the judicially created right of pri-

---

**14.** *See Journal of the Proceedings of the Convention of Delegates Elected by the People of Tennessee to Amend, Revise, or Reform and Make a Constitution for the State* 61 (Jan. 13, 1870), 94 (Jan. 18, 1870). I reference the Journal of the Convention because "[i]f there should be doubt though it is the first obligation of the Court to go to the proceedings of the Constitutional Convention which adopted this provision and see from these proceedings

what the framers of this resolution intended it to mean." *Shelby County v. Hale,* 200 Tenn. 503, 511, 292 S.W.2d 745, 748 (1956). In fact, the re-enacted version of Article I, section 8 was unamended except for changing the word "freeman" to "man" and removing the commas after the words "taken," "destroyed," "liberty," and "peers." The word "freehold" was also divided into two words.

vacy than the federal Constitution is contrary to nearly two hundred years of legal precedent.

Although I certainly respect the judgment of my colleagues, I believe that the Court has overstepped its authority with this decision. Its factual declaration of the fundamental nature of the right of privacy—and by extension, abortion—harkens back to a time when opinions of the courts were justified by "natural law," whose malleable and fluid nature permitted almost any conclusion to be adopted.[15] Although the language is not seen in our cases today, we should be reminded that at one time, the courts of this state routinely held that a duly-enacted statute

> cannot be invalidated upon some supposed or assumed natural right or equity, upon the general statement that it is *opposed to the inherent rights* of freemen, nor upon any *spirit supposed to pervade* the constitution not expressed in words, nor because it is opposed to the genius of a free people, nor upon any general or vague interpretation of a provision *beyond its plain and obvious import.*

*Leeper v. State,* 103 Tenn. 500, 510–11, 53 S.W. 962, 964 (1899) (emphasis added); *see also Henley v. State,* 98 Tenn. 665, 682, 41 S.W. 352, 354 (1897); *Stratton Claimants v. Morris Claimants,* 89 Tenn. 497, 511, 15 S.W. 87, 90 (1891); *Davis v. State,* 71 Tenn. (3 Lea) 376, 378 (1879).

Nevertheless, despite this ancient concern, the majority has undertaken to use this precise form of adjudication. It has held that the abortion regulations of this state are violative of the right of privacy, which "pervades" the constitution and which is reflected in several of its provisions. It has held that the rights to privacy and abortion are "inherent" and fundamental, though neither enjoys textual support in the Constitution. It has further held that the protections of the "Law of the Land" Clause are beyond that which has been interpreted as its "plain and obvious" import.

I am unsure why constitutional interpretation in this state has deviated from these maxims. It could be that we have grown wiser over the past century, or it could be that our courts have ignored the fact that the people of this state—rather than the courts—are ultimately in the best position to make such policy decisions.[16] Whatever the reasons, I know that these tenets provide a sound basis from which to begin our analysis, and the majority could do much worse than to pay heed.

I do not wish to be misunderstood. Without a doubt, "due process is not a static legal principle, [and], in a free society, it is an advancing standard consisting of those basic rights which are deemed reasonable and right." *See City of White House v. Whitley,* 979 S.W.2d 262, 266 (Tenn.1998). For the integrity and legitimacy of this Court to be maintained, though, the growth of the law must at all times be solidly grounded in logic, reason, and experience. The power to declare

---

15. As an illustration of the malleable nature of natural law, one commentator has noted that

> natural law has had as its content whatever the individual in question desired to advocate. This has varied from a defense of theocracy to a defense of the complete separation of church and state[;] from revolutionary rights in 1776 to liberty of contract in recent judicial opinions[;] from the advocacy of universal adult suffrage to a defense of rigid limitations upon the voting power[;] ... from the advocacy of the inalienable right of secession to the assertion of the natural law of national supremacy[;] from

> the right of majority rule to the rights of vested interests.

Benjamin Fletcher Wright, Jr., *American Interpretations of Natural Law: A Study in the History of Political Thought* 339–40 (1931).

16. Remember the words of Alexander Hamilton in *The Federalist No. 78:* "It can be of no weight to say that the courts, *on the pretense of a repugnancy,* may substitute their own pleasure to the constitutional intentions of the legislature." This might as well happen in the case of two contradictory statutes; or it might as well happen in every adjudication upon any single statute." (emphasis added).

laws unconstitutional that are otherwise duly enacted by representatives of the people is an awesome power, and in exercising this power, the judiciary must be prepared in all cases to state with clarity and precision the specific reasons upon which its constitutional decisions are made.

In my opinion, this Court today has failed in this most essential duty. Even when presented with more than two centuries of legal precedent to the contrary, the majority boldly concludes that "we remain opposed to any assertion that previous decisions ... require[ ] this court to interpret our constitution as coextensive to the United States Constitution." After reading such an astonishing statement that the constitution is subject to the whim and mercy of the present members of the Court, the next logical question must necessarily be: Of what benefit is a written constitution, with settled interpretation, that purports to guarantee rights and limit the powers of government? The answer must surely be "none," because when courts take it upon themselves to amend the constitution at will through their own interpretive devices, the benefit of written constitutions with settled interpretation is lost. As the majority must certainly recognize with its citation to Article I, section 1, though, it is the prerogative of the *people*—not that of the courts—to "alter, reform, or abolish the government in such a manner as they may think proper."

The Court's decision today illustrates well the dangers of constitutional interpretation that is akin to "making it up as you go." The majority can offer no legitimate reason why strict scrutiny analysis is compelled other than it can require this standard through exercise of its inherent authority. Because the right of privacy enjoys no textual support in our Constitution, the right serves at the pleasure of the judiciary, and therefore, it can be easily manipulated by courts desiring to legislate from the bench. Expansion and "interpretation" of this "fundamental right" of privacy allow courts to impose upon the people their own view of the wisdom, propriety, and desirability of challenged legislation.

It is for these reasons that I dissent.

## III. "UNDUE BURDEN" STANDARD OF REVIEW

Even assuming for sake of argument that the right of privacy guaranteed under the state constitution is more broad than the corresponding federal right, it is still not reasonable to subject abortion regulations to strict scrutiny analysis. The very problem with the right of privacy is that the right enjoys no textual support in our Constitution, and the right may be stretched to encompass virtually any perceived injustice. To conclude that all rights falling within the rubric of privacy are subject to the same level of constitutional scrutiny ignores the fact that every "privacy" right that we discover may not be entitled to such practical immunity from reasonable regulation.

Although the majority portrays itself as lawfully bound to apply strict scrutiny analysis because the right to obtain an abortion is a "fundamental right" under the Tennessee Constitution, no case or rule of law compels this result. While the majority relies heavily upon *Davis* to provide the constitutional basis for its decision today, *Davis* simply cannot be read to mean that the state right of privacy is so broad as to require strict scrutiny in all cases involving infringement of that right, particularly when the federal Constitution does not so require. I can find no language in that opinion which actually declares that the right of privacy is fundamental under the state constitution, as one would certainly expect, and according to my reading of *Davis*, if the right of privacy is fundamental at all, it is because federal courts have so held under the federal Constitution.

It is worth remembering, though, that the United States Supreme Court also views the right to obtain an abortion as a

"fundamental right," yet that Court has stopped reviewing abortion regulations under the strict scrutiny standard of *Roe*. The Supreme Court has reached this conclusion while simultaneously acknowledging in other cases that other privacy rights are usually protected by strict scrutiny analysis. Reading footnote seven of the majority opinion in this case, one would think that this Court is of the same opinion today, as the majority remarks that "*[d]ifferent tests may be warranted in different contexts.*" (emphasis added). This important principle having been admitted, it is of some wonder, then, why the majority goes to great pains to overrule scores of cases and centuries of constitutional interpretation to arrive at a decision that is not even compelled by our great charter of government.

### A. The Flexibility of the "Undue Burden Standard"

The majority's primary criticism of the undue burden standard is that it provides "no standard at all" by which to review abortion regulations. Without a doubt, reasonable minds will sometimes disagree as to whether a particular regulation constitutes an undue burden on the right to obtain an abortion. Indeed, reasonable disagreement as to the meaning of rules and standards is commonplace in many parts of our law and is a direct conse-

quence of the common law system of adjudication inherited from England. Despite its shortcomings, though, the flexibility of the undue burden standard is its very strength, and this more flexible standard allows courts to accommodate various interests and to fashion appropriate relief under the circumstances of an individual case.

By way of contrast, the application of strict scrutiny is not flexible at all, and I can find no case in this state where application of this standard has resulted in upholding the challenged law. With the adoption of strict scrutiny, this Court has forced the State of Tennessee into an "all-or-nothing" scenario, where only the most impeccably drafted legislation withstands the slightest possibility of darkening the constitutional doorway. I simply cannot fathom that the people of Tennessee, who outlawed the practice of abortion until *Roe v. Wade*, intended to remove all power from themselves to enact reasonable regulations on abortion. Nevertheless, this is the very conclusion reached by the majority today.

Even despite the majority's admittedly legitimate concerns, the undue burden standard is practically no more flexible than any other standard of review. After all, even strict scrutiny analysis begs the question of how a right achieves fundamental status,[17] or even how a state inter-

---

17. Take for example the majority's declaration that the right of privacy is a fundamental right. In its decision today, the majority states that a right is deemed fundamental when it is "inherent in our most basic concepts of liberty" or when it is "inherent in the concept of ordered liberty." The previous standard, however, was that rights are fundamental "when they are either implicitly or explicitly protected by a constitutional provision." *State v. Tester*, 879 S.W.2d 823, 828 (Tenn.1994).

Clearly, the standard adopted today is more broad than the standard used in *Tester*, as the *Tester* standard required at least some tangential connection to a specific provision in the Constitution. Before decrying the flexibility of the undue burden standard, we should remember that the vague concepts of the

strict scrutiny standard can be just as dangerous. The flexibility of the "inherent in the concept of ordered liberty" standard is fully demonstrated by the ability of the majority to claim that the right to abort a fetus is part of our most basic concepts of liberty.

Interestingly, the majority cites *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), for the proposition that fundamental rights are "those liberties that are 'deeply rooted in this Nation's history and tradition.' " The Supreme Court in *Bowers*, however, declined to find a fundamental right to engage in sodomy, as the practice of sodomy has never been deeply rooted in our history and tradition.

With its decision today, though, I suspect that the Tennessee Supreme Court would be compelled to find that engaging in sodomy is part of the fundamental right of privacy, and

est becomes "compelling," rather than merely "important" or "legitimate." [18] Other objective constitutional standards, such as the "reasonableness" of a search, or the "fairness" of a trial, are just as capable of lawless decision making by judges who refuse to follow precedent or who wish to place their own imprimatur upon the law.

The undue burden standard, though, is not subjective or without definition as the majority asserts. As *Casey* defined the standard, the phrase "undue burden" is shorthand for those regulations which have "the *purpose or effect* of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." 505 U.S. at 877, 112 S.Ct. 2791 (emphasis added). Surely the majority does not shy away from the undue burden standard because it requires an examination of the *purpose* of a statute, as this task is performed daily within the halls of this hallowed institution. Moreover, an examination of the *effects* of a regulation requires only that the parties fully develop and document the appellate record and that the reviewing court diligently consider the relevant parts of that record. Contrary to the majority's assertions, therefore, a court that is faithful to its duty "to declare what the law is" does have an objective benchmark by which to measure whether a regulation places an undue burden on the right to obtain an abortion.

Without any citation to legal authority or analysis whatsoever, the majority boldly declares that it would find that all of the challenged regulations also place an undue burden on the right to obtain an abortion. The majority then uses my disagreement with this statement to illustrate the "subjective nature" of the undue burden standard. The majority is certainly correct that application of the undue burden standard can result in "subjective" analysis, but only when that "analysis" consists of bald declarations of unconstitutionality. The reasoned judgment of the Court—not the adoption of strict scrutiny—is the check in our system against the arbitrary exercise of judicial power. So long as the judgment of the court can be supported by experience, logic, and precedent, then I cannot conceive that any standard, including the undue burden standard, "offers no real guidance and engenders no expectation among the citizenry that governmental regulation of abortion will be objective, evenhanded, or well-reasoned." [19]

It is true that by using the undue burden standard, we are forced to put our trust and faith in judges of good character who are dedicated to sound and reasoned interpretations of law, and I agree that we would be in trouble if the judges took it upon themselves to make law rather than

therefore, would be obliged to grant this practice the absolute protection of strict scrutiny analysis. The Court even cites with approval *Campbell v. Sundquist*, a case from the Court of Appeals which holds that sodomy is a fundamental right after inventing from thin air an ultra-broad right of privacy in this state.

18. The majority acknowledges that the State "has a compelling interest in maternal health from the beginning of pregnancy." As its authority for this statement, the majority cites Article I, section 1 of the Tennessee Constitution which seems, on its face, to address only the people's collective power to adopt, reform, or abolish their political government. No mention is made in this clause as to the ability to engage in personal and private activities.

I agree with the majority that the State's interest in this case is compelling. I use this example merely to illustrate that the majority could have easily declared that nothing in Article I, section 1 gives the state a compelling interest in maternal health during pregnancy. Nevertheless, the Court was able to reach a correct conclusion in this one instance by applying the conceptually difficult "compelling interest" standard.

19. In addition, the majority criticizes the undue burden standard because it is less than ten years old. Given that the majority overrules *two centuries* of case law holding that Article I, section 8 is identical in scope and effect with federal due process, one may legitimately wonder how long a standard must survive to be worthy of this Court's consideration.

**44**

interpret it. So long as the Court is able to make a reasoned decision, the majority's fears concerning the undue burden standard should be minimized. It is my hope and expectation, perhaps naïvely so, that reason and sound judgment would prevail at the end of the day. The flexibility of the undue burden standard is simply not a legitimate reason to adopt the wrought-iron hammer of strict scrutiny.

## B. Strict Scrutiny and Accommodation of All Interests

The right to obtain an abortion is the single most complex right falling under the privacy umbrella, and these "procreational rights" involve a myriad of interests other than that of the mother, including those legitimate interests of the fetus, the father,[20] and certainly of the state. As the Supreme Court of Mississippi held when faced with this same question:

> While we have previously analyzed cases involving the state constitutional right to privacy under a strict scrutiny standard requiring the State to prove a compelling interest, we are not bound to apply that standard in all privacy cases. The abortion issue is much more complex than most cases involving privacy rights. We are placed in the precarious position of both protecting a woman's right to terminate her pregnancy before viability and protecting unborn life. In an attempt to create a workable framework out of these diametrically opposed posi-

tions, we adopt the well reasoned decision in *Casey,* applying the undue burden standard to analyze laws restricting abortion. We do not limit any future application of the strict scrutiny standard for evaluating infringement on a person's right to privacy in other areas.

*Pro–Choice Miss. v. Fordice,* 716 So.2d 645, 655 (Miss.1998).

Because strict scrutiny is usually "strict in theory, and fatal in fact," I question the Court's decision only to permit the General Assembly to enact regulations when those regulations are the least restrictive means to achieve the precise interest at stake. More specifically, I question whether abortion regulations can ever be crafted to serve a single interest, and any effort to balance and accommodate several competing interests may result in the regulation failing strict scrutiny with respect to any single interest. Indeed, as the United States Supreme Court has conceded, the state's "important and legitimate interest in potential life ... has been given too little acknowledgment and implementation by the Court in its subsequent cases [using the strict scrutiny standard of *Roe*]." *Casey,* 505 U.S. at 871, 112 S.Ct. 2791; *see also Thornburgh v. American College of Obstetricians & Gynecologists,* 476 U.S. 747, 828, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (O'Connor, J., dissenting) ("The State has compelling interests in ensuring maternal health and in protecting potential human life, and these interests exist

---

**20.** The interest of the father in fetal life is usually ignored in the abortion debate. The father's interests are at least equal (and, in some cases, will even outweigh) the interest of the mother in the case of pre-embryos, *Davis v. Davis,* 842 S.W.2d 588 (Tenn.1992), and the father's interests are at least equal with that of the mother when dealing with the control and care of children, absent substantial danger of harm to the child, *Hawk v. Hawk,* 855 S.W.2d 573 (Tenn.1993). With regard to the abortion context, even the Supreme Court of the United States has stated that a husband "has a 'deep and proper concern and interest ... in his wife's pregnancy and in the growth and development of the fetus she is carry-

ing.'" *Casey,* 505 U.S. at 895, 112 S.Ct. 2791 (quoting *Planned Parenthood v. Danforth,* 428 U.S. 52, 69, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976)).

Although one must concede the constitutional argument that the interests of the husband or father cannot completely overcome the interests of the mother in the abortion context, the strict scrutiny analysis adopted by the majority completely ignores the father's interest as if it never existed. Any proper standard of review of abortion regulations must recognize the fact that a myriad of important interests is involved and that strict scrutiny analysis simply cannot accommodate these competing concerns.

'throughout pregnancy.'"), *overruled by, Casey,* 505 U.S. at 881, 112 S.Ct. 2791.

Because the majority opinion refuses to recognize that many interests may be furthered by a single regulation, it weighs the value of a regulation against a single interest in order to strike down the regulation. For example, in its discussion of the mandatory waiting period, the majority concludes that the regulation cannot survive strict scrutiny simply because it does not "further the State's interest in maternal health." When considering the possible purposes of the regulation, however, I recognize that the state also has an interest in fetal life, and that this interest combined with the state's interest in ensuring "informed and deliberate" decision making, *see Casey,* 505 U.S. at 885, 112 S.Ct. 2791, could work to uphold the regulation. Although the "undue burden" standard does not fully work to accommodate all the various interests involved, the standard certainly recognizes that the legislature may work to advance several interests with a single regulation. Nevertheless, with its adoption of strict scrutiny today, this Court is set to spiral down the same road which has already been traveled and abandoned by the United States Supreme Court. We do so while recognizing that this path is a rough one and not wide enough to safely accommodate all of its travelers.

Although I understand the apparent motives of the majority, the judiciary of this state is simply not legitimately empowered to make our Constitution say today what it did not say yesterday. After all, if I were vested with law-making authority and "remain[ed] opposed to any assertion that previous decisions" should control the outcome of this case, it could be that I would also require a different constitutional standard when reviewing abortion regulations—I would probably only require the challenged regulation to be rationally related to the state's legitimate interests in ensuring maternal health and fetal life. Nevertheless, I recognize that the history,

language, and structure of our Constitution provide protection that is co-extensive with federal due process.

Accordingly, for the reasons given above, I would hold that the "undue burden" standard developed by the United States Supreme Court in *Planned Parenthood v. Casey* should apply to review abortion regulations under the Tennessee "Law of the Land" Clause. This standard is proper because our historical interpretation of the "Law of the Land" Clause is substantially identical to that of the Due Process Clause of the Fourteenth Amendment, and because the "undue burden" standard better works to accommodate the myriad of interests arising in this increasingly complex issue of public policy.

## IV. APPLICATION OF THE "UNDUE BURDEN" STANDARD

In *Casey,* the United States Supreme Court rejected strict scrutiny as the standard of review for regulations of abortion. In attempting to craft a standard of review that balanced the state's interests in protecting potential life, in regulating maternal and fetal health, and in expressing a preference for childbirth over abortion against a woman's right to terminate her pregnancy, the Court adopted an undue burden standard for statutes regulating pre-viability abortions. *See Casey,* 505 U.S. at 870–79, 112 S.Ct. 2791. Under the undue burden standard, a statute is unconstitutional only if it has "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877, 112 S.Ct. 2791. At the point of viability, the State's interest becomes far greater, and it may heavily regulate, or even completely proscribe abortion, except where the procedure is necessary to preserve a mother's life or health. *See id.* at 879, 112 S.Ct. 2791; *see also Stenberg v. Carhart,* 530 U.S. 914, ——, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000).

## A. Medical Emergency Exception

In *Casey,* the United States Supreme Court began its analysis of Pennsylvania's abortion statutes by examining the exception for abortions in medical emergencies. The Court did so because it characterized the medical emergency exception as central to the operation of the statute's other provisions. *See id.* at 879, 112 S.Ct. 2791. The statute defined "medical emergency" as a condition necessitating immediate abortion "to avert [the mother's] death or for which substantial delay will create serious risk of substantial and irreversible impairment of a major bodily function." *Id.* Planned Parenthood argued that the exception was so narrowly defined that it foreclosed the possibility of an abortion in some circumstances in which the mother would be exposed to a threat to her health. The Court concluded that the statute was sufficiently broad to encompass all serious health risks. *See id.* at 880, 112 S.Ct. 2791. The Court noted, however, that if the statute did limit abortions in some circumstances in which the health of the mother would be endangered, the statute would have been unconstitutional because "the essential holding of *Roe* forbids a State to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health." *Id.*

The Supreme Court has recently reaffirmed this holding of *Casey* in *Stenberg v. Carhart,* 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). In striking down a law prohibiting an abortion procedure commonly known as "partial birth abortion," the Court noted that "the law lacks any exception " 'for the preservation of the . . . health of the mother.' " 530 U.S. at ——, 120 S.Ct. 2597 (quoting *Casey,* 505 U.S. at 879, 112 S.Ct. 2791). In her concurring opinion providing the crucial fifth vote for the majority, though, Justice O'Connor stated that if the Nebraska law was not as sweeping and if it "included an exception for the life and health of the mother," then the law "would be constitu-

tional in [her] view." Thus, even after *Stenberg,* any system of abortion regulations must provide a medical emergency exception for the life *and health* of the mother to pass constitutional muster.

Tennessee's abortion statutes contain three separate medical emergency exceptions. Tennessee Code Annotated section 39–15–202(d)(3) (1997) suspends the forty-eight hour waiting period requirement when it would "endanger the life of the pregnant woman." In addition, section 202(g) preempts the operation of the informed consent provisions as well as the waiting period when "necessary to preserve the life of the pregnant woman." Neither of these provisions contains an exception when the health of the mother is threatened. Tennessee Code Annotated section 39–15–201(c)(3) (1997) does provide that a woman may procure an abortion when necessary to preserve her life or health; however, this section applies only in situations when the fetus is viable.

The State argues that the medical emergency provision for the health of a woman in section –201(c)(3) may be read into the medical emergency provisions of section –202. According to the State, the General Assembly added section –201(c)(3) in response to a federal court order enjoining the abortion regulations because they did not contain a medical emergency exception for the life of the mother. The General Assembly, though, also added section –202(g) at the same time. Consequently, while the General Assembly explicitly provided for the exception to apply when the *life or health* of the mother carrying a viable fetus was threatened in one provision, it provided a medical emergency exception in another section added at the time that covered circumstances only when the *life* of a woman carrying a pre-viable fetus was threatened.

Clearly, the General Assembly knew how to provide for a medical emergency exception for the health of a woman carrying a pre-viable fetus when it so desired, and the absence of the health exception in

section –202 must, therefore, be presumed to be intentional. Courts may read terms into the text of a statute when such an interpretation would clearly further the intent of the legislature or when the term to be supplied was clearly omitted only by inadvertence or mistake. *See In re Swanson,* 2 S.W.3d 180, 186 (Tenn.1999); *Knoxville Power & Light Co. v. Thompson,* 152 Tenn. 223, 226, 276 S.W. 1050, 1051 (1925). Nevertheless, I cannot conclude under the circumstances that reading the word "health" into section –202 would further the clear intent of the legislature or that the word "health" was omitted in section –202 only by inadvertence or mistake.

I conclude, therefore, that the plain language of Tennessee's abortion statutes does not provide a medical emergency exception to the challenged regulations when the *health* of a woman carrying a pre-viable fetus is threatened. Consequently, I am compelled by the United States Supreme Court's decision in *Casey* to also conclude that the failure to provide a medical emergency exception for the health of a woman carrying a pre-viable fetus is unconstitutional, and that this failure renders the other challenged provisions unconstitutional under the Due Process Clause of the Fourteenth Amendment and the "Law of the Land" Clause of the Tennessee Constitution. But for this deficiency in the medical emergency exceptions, I would find the remainder of the challenged provisions to be constitutionally sound.

## B. Informed Consent Provisions of Tennessee Code Annotated section 39–15–202

The challenged informed consent provisions of section 39–15–202 can be divided

into three components: (1) an attending physician requirement; (2) content requirements; and (3) a mandatory waiting period.

### Attending Physician Requirement

Tennessee Code Annotated section 39–15–202(b) provides:

> In order to ensure that a consent for an abortion is truly informed consent, an abortion shall be performed or induced upon a pregnant woman only after she has been orally informed by her attending physician of the following facts and has signed a consent form acknowledging that she has been informed as follows. . . .

The Court holds that this provision is unconstitutional because it is not narrowly tailored to achieve the State's legitimate and important interest in guaranteeing that a patient be informed of the risks of a medical procedure in accordance with recognized standards of acceptable professional practice. I disagree.[21]

In *City of Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 448, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), *overruled by, Casey,* 505 U.S. at 884–85, 112 S.Ct. 2791, the United States Supreme Court similarly held that the critical factor in ensuring informed consent "is whether [a woman] obtains the necessary information and counseling from a qualified person, not the identity of the person from whom she obtains it." In *Casey,* however, the Court rejected this portion of *Akron* and concluded that an attending physician requirement was an appropriate exercise of a State's "broad latitude to decide that particular functions may be performed only by licensed professionals, even if an

---

**21.** I also note that it is unclear which standard the Court uses to reach its conclusion. The Court purports to apply a standard requiring that the State narrowly tailor its abortion regulation to further a compelling interest. The Court does not explain why the attending physician provision does not satisfy the narrowly tailored requirement, because the requirement does in fact seem to be "rea-

sonably related" to the state's compelling interest. Rather, the Court contends that the regulation is constitutionally invalid because other medical professionals could provide the requisite information. Essentially, though it does not say so, the Court is applying a "least restrictive means" standard which inevitably will result in striking down every regulation.

objective assessment might suggest that those same tasks could be performed by others." 505 U.S. at 884–85, 112 S.Ct. 2791. Accordingly, the Court held that Pennsylvania's attending physician requirement was constitutional. Section – 202(b) is not appreciably different from the provision examined by the United States Supreme Court in *Casey*, and I would therefore hold that it is constitutional under the Due Process Clause of the Fourteenth Amendment and, by extension, Article 1, section 8 of the Tennessee Constitution.

*Content Requirements*

Several provisions of section 39–15–202(b) and (c), which require the attending physician to apprise a pregnant woman seeking an abortion of certain information, have been challenged as unconstitutional. These particular informational requirements are as follows:

(b)(1) That according to the best judgment of her attending physician she is pregnant;

(2) The number of weeks elapsed from the probable time of the conception of her unborn child, based upon the information provided by her as to the time of her last menstrual period or after a history, physical examination, and appropriate laboratory tests;

(3) That if more than twenty-four (24) weeks have passed from the time of conception, her child may be viable, that is, capable of surviving outside of the womb, and that if such child is prematurely born alive in the course of an abortion her attending physician has a legal obligation to take steps to preserve the life and health of the child . . . .

(4) That abortion in a considerable number of cases constitutes a major surgical procedure;

(5) That numerous public and private agencies and services are available to assist her during her pregnancy and after the birth of her child, if she chooses not to have the abortion, whether she wishes to keep her child or place the child for adoption, and that her physician will provide her with a list of such agencies and the services available if she so requests;

(6) Numerous benefits and risks are attendant either to continued pregnancy and childbirth or to abortion depending upon the circumstances in which the patient might find herself. The physician shall explain these benefits and risks to the best of such physician's ability and knowledge of the circumstances involved.

(c) At the same time the attending physician provides the information required by subsection (b), such physician shall inform the pregnant woman of the particular risks associated with her pregnancy and childbirth and the abortion or child delivery technique to be employed, including providing her with at least a general description of the medical instructions to be followed subsequent to the abortion or childbirth in order to ensure her safe recovery.

The State has a number of substantial interests that it may further by requiring that certain information be provided prior to an abortion. Of course, the State has an interest in the physical health of a woman, which it may further by requiring that the woman be told of the health risks of abortion and childbirth. *See Casey*, 505 U.S. at 882, 112 S.Ct. 2791. The scope of information that can be required includes, but is not limited to, "the nature of the procedure, the attendant health risks and those of childbirth, and the 'probable gestational age' of the fetus." *Id.*

The State also has an interest in the psychological health of a woman. *See id.* Information concerning the impact of an abortion on a fetus furthers this interest by reducing the risk that a woman who obtains an abortion will suffer devastating psychological consequences. *See id.*

Moreover, the State has an interest in protecting the life of the unborn, irrespec-

tive of whether the fetus is viable. *See id.* at 846, 883, 112 S.Ct. 2791. The State may pursue this interest by requiring that a woman be informed of the development of the fetus and assistance that would be available if she chose to carry the fetus to full term. *See id.* at 883, 112 S.Ct. 2791. It does not matter that the State's interest may be purely a preference for childbirth over abortion. Because such requirements cannot be considered substantial obstacles to obtaining abortions, they are not undue burdens and may be imposed. *See id.* In short, "[i]f the information the State requires to be made available to the woman is truthful and not misleading, the requirement may be permissible." *Id.* at 882, 112 S.Ct. 2791.

In *Casey,* the United States Supreme Court examined content requirements of Pennsylvania's abortion statutes which, except for section –202(b)(6), are analogous to those that are challenged before this Court. The *Casey* Court upheld the constitutionality of each of the challenged provisions. Given the wide constitutional latitude within which a state may regulate abortion without violating either the Fourteenth Amendment of the Due Process Clause or the "Law of the Land" Clause, I find that none of the challenged provisions is suspect. Section –202(b)(1)–(3), -(5) and section –202(c) are clearly within the bounds of the United States Supreme Court's decision in *Casey* and are, without doubt, constitutional.

Although the *Casey* Court did not examine a statute similar to section –202(b)(6), the general principles announced in *Casey* are sufficiently broad to encompass this provision as well. Section –202(b)(6) essentially complements section –202(c) by requiring a woman's physician to explain the benefits as well as risks of continuing with a pregnancy or aborting a fetus. The duty imposed on physicians by section –202(b)(6) is easily satisfied during the course of meeting the other informed consent requirements. Moreover, I would find this provision no more constitutionally

offensive than I would a requirement that a physician performing any other medical procedure inform a patient of the benefits of that procedure. The information compelled by section –202(b)(6) is neither untruthful nor misleading, and I would therefore hold that it is constitutional under the Due Process Clause of the Fourteenth Amendment and, by extension, the "Law of the Land" Clause of the Tennessee Constitution.

As the majority notes, the State has conceded that section –202(b)(4) is unconstitutional. However, I do not find that this concession necessarily renders the remainder of the informed consent requirements unconstitutional. "The fact that one provision of a statute is unconstitutional does not affect the validity of other independent provisions." *State v. Murray,* 480 S.W.2d 355, 356 (Tenn.1972). Under the doctrine of elision, a court may elide the unconstitutional provision of a statute while finding the remaining portions to be constitutional and effective. *See Lowe's Cos., Inc. v. Cardwell,* 813 S.W.2d 428, 430 (Tenn.1991).

Significantly, the General Assembly enacted the current abortion statutes as part of the 1989 Criminal Code revision, which did contain a general severability clause, *see* 1989 Tenn.Pub.Acts ch. 591, § 120, and the legislature has elsewhere expressed its general intention that unconstitutional provisions of a statute may be elided in order to give effect to the remainder of the statute, *see* Tenn.Code Ann. § 1–3–110 (1994). Contrary to the conclusion reached by the majority, section –202(b)(4) is not essential to the operation of the informed consent provisions, and its elision does not create an incomplete statute. *Cf. Frost v. City of Chattanooga,* 488 S.W.2d 370, 373 (Tenn.1972). As such, I disagree that the General Assembly believed section –202(b)(4) to be a necessary component of the informed consent requirements, and I therefore find that the remainder of section –202 could still be enforced despite the State's con-

cession that section 202(b)(4) is unconstitutional.

### Mandatory Waiting Period

In addition to the attending physician requirement and the content requirements, section –202 also provides that "[t]here shall be a two-day waiting period after the physician provides the required information, excluding the day on which such information was given. On the third day following the day such information was given, the patient may return to the physician and sign a consent form." Tenn.Code Ann. § 39–15–202(d)(1) (1997).

The Court strikes the down the mandatory waiting period requirement, in part, because it does not further the State's interest in maternal health. This conclusion is largely the product of the Court's inability or refusal to consider the other interests that the State may pursue. A period of reflection not only furthers the State's legitimate interest in a patient's psychological well-being, but a waiting period also furthers the State's interest in expressing a preference for childbirth over abortion. These are legitimate and substantial interests that the State may constitutionally pursue, and the majority's failure to recognize these interests is troubling.

The Court also finds the mandatory waiting period unconstitutional because waiting periods require two trips to a physician which may be problematic for women who work, women who are in abusive relationships, and women who travel great distances. I disagree. It is beyond dispute that waiting period requirements are permissible forms of regulation. "The idea that important decisions will be more informed and deliberate if they follow some period of reflection [is not] unreasonable, particularly where the statute directs that important information become part of the background of the decision." *Casey*, 505 U.S. at 884, 112 S.Ct. 2791.

This Court's concern with the impact of the waiting period is not a sufficient reason to strike down this provision. In *Casey*, the United States Supreme Court conceded that waiting periods increased the risk that some women would be exposed to harassment from anti-abortion protesters. *See id.* at 886, 112 S.Ct. 2791. The Court also observed that a waiting period would be taxing on some women with limited financial resources and those who had to travel long distances. *See id.* at 885–86, 112 S.Ct. 2791. The Court additionally noted the problems some women would have in explaining absences to husbands, employers, or others. *See id.* at 886, 112 S.Ct. 2791. While the Court characterized these incidental effects of the waiting period as "troublesome," it nevertheless concluded that the waiting period did not constitute an undue burden. *See id.*

The only real distinction between section –202(d) and the Pennsylvania statute in *Casey* is that the Pennsylvania statute imposed a twenty-four hour waiting period while section –202(d) imposes a forty-eight hour waiting period. However, I do not find this distinction to be critical. The *Casey* Court upheld Pennsylvania's twenty-four hour waiting period even though it noted the district court's finding that "the practical effect [would] often be a delay of much more than a day." 505 U.S. at 885–86, 112 S.Ct. 2791. With an appropriate medical emergency exception in place, any concerns with increased health risks of a two-day delay would be alleviated. Thus, I would find that section 39–15–202(d) does not constitute an undue burden.

### C. Mandatory Hospitalization

Tennessee Code Annotated section 39–15–201(c)(2) (1997) requires that abortions performed after three months of pregnancy but before viability be completed "in a hospital as defined in [section] 68–11–201, licensed by the state department of health or a hospital operated by the state of Tennessee or a branch of the federal government." I would find that this statute does not act as a substantial obstacle to

women seeking abortions. First, this provision does further the State's interests in protecting both the health of the mother and of the fetus. The Court, in its analysis of this provision, casually disregards any danger of complications arising during the course of an abortion and asserts instead that abortions during the period regulated by section –201(c)(2) can be safely performed in free-standing surgical facilities in addition to hospitals. While this may be true, it is also true that life-threatening complications may indeed accompany an abortion procedure. Such complications can include hemorrhaging, bacterial shock, acute renal failure, septicemia, metritis, parametritis, peritonitis, serious morbidity, and mortality. *See* F. Gary Cunningham, et al., *Williams Obstetrics* 506–07 (18th ed.1989). With this in mind, I am not prepared to conclude that the State has no legitimate interest to promote through section –201(c)(2). Hence, I find that section 39–15–201(c)(2) furthers the State's interest in maternal and fetal health within the constitutional limitations set by *Casey*.[22]

I also find that the effect of section – 201(c)(2) does not constitute an undue burden. In *Casey*, the Court expressed concern that statutes might prohibit "significant numbers" of women from obtaining abortions. *See* 505 U.S. at 893–94, 112 S.Ct. 2791. Such statutes, the Court concluded, were unconstitutional because they constituted substantial obstacles, thus failing the undue burden test. However, as the Court of Appeals in this case observed, section –201(c)(2) affects less than two percent of all abortions sought in Tennessee. Clearly, significant numbers of women are not precluded from obtaining abortions by section –201(c)(2).

While section –201(c)(2) may increase the inconvenience and cost of obtaining an abortion for some women, this is not a sufficient reason to strike down the regulation as unconstitutional. As I noted with regard to the mandatory waiting period, abortion regulations are not rendered unconstitutional because they have such incidental effects. Given the limited number of women affected by section –201(c)(2) and the State's legitimate interests that it protects by regulating this medical procedure, I would uphold its constitutionality under the Due Process Clause of the Fourteenth Amendment and the "Law of the Land" Clause of the Tennessee Constitution.

## V. CONCLUSION

In conclusion, I would hold that regulations on the right to obtain an abortion are to be reviewed under the "undue burden" standard adopted by the United States Supreme Court in *Planned Parenthood of Southeastern Pennsylvania v. Casey*. The right to obtain an abortion is protected under the state constitution, if at all, by the "Law of the Land" Clause in Article I, section 8; the history, language, and application of this clause show that its protections are, at most, co-extensive with those afforded by the Due Process Clause of the Fourteenth Amendment.

With its opinion today, the majority has failed in its most essential duty to articulate the basis of its decision with a clear and precise rationale, and it has failed to establish an adequate foundation for its decision in legal precedent. While the law certainly must have room to grow and expand as the values and virtues of society change, this growth cannot come from the judiciary without having a firm foundation in reason, precedent, and experience. In holding that abortion regulations are reviewed under a strict scrutiny standard of review, the Court has ignored prior Tennessee law and history, and the use of this standard fails to sufficiently accommodate

---

**22.** While the Court contends that mandated hospitalization fails strict scrutiny, it concedes that the State may impose equipment and staffing standards on facilities that do not meet the requirements of section –201(c)(2). Presumably, then, the General Assembly could impose on such facilities the same regulations imposed on hospitals as defined in Tennessee Code Annotated section 68–11–201 (1996).

the important and competing interests involved in this complex issue.

Even under the more lenient "undue burden" standard of review, however, I would find that the medical emergency exceptions are unconstitutional because they operate to prohibit obtaining an abortion when the *health* of a woman carrying a pre-viable fetus is threatened. But for this deficiency in the medical emergency exceptions, I would find the remainder of the challenged provisions to be constitutionally sound.